2003 WY 47

James Martin HARLOW, Appellant (Defendant),

v.

The STATE Of Wyoming, Appellee (Plaintiff).

James Martin Harlow, Appellant (Defendant),

v.

The State Of Wyoming, Appellee (Plaintiff).

James Martin Harlow, Appellant (Defendant),

v.

The State Of Wyoming, Appellee (Plaintiff).

Nos. 99–58, 99–59, 99–60.

Supreme Court of Wyoming.

April 14, 2003.

Rehearing Denied May 20, 2003.

Order Staying Execution of Sentence May 29, 2003.

Tim Newcomb of Grant & Newcomb, Laramie, Wyoming, Representing Appellant.

Gay Woodhouse, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Hugh Kenny, Senior Assistant Attorney General; Georgia L. Tibbetts, Senior Assistant Attorney General; Kimberly A. Baker, Senior Assistant Attorney General, Representing Appellee. Argument by Ms. Baker.

Before GOLDEN, LEHMAN*, and MACY (Retired), JJ., and SULLINS, D.J.

## TABLE OF CONTENTS

Opening .................................................................... ¶¶ 1–6

Issues ...................................................................... ¶ 7

Facts ....................................................................... ¶¶ 8–14

Discussion

 I. Voir Dire ................................................... ¶¶ 15–24

 II. Denial of Motion to Suppress ...................................... ¶¶ 25–37

\* Chief Justice at time of oral argument

III. Victim Impact Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ¶¶ 38–57

IV. Denial of Post–Trial Motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ¶¶ 58–68

V. Denial of Motion to Supplement Appellate Record . . . . . . . . . . . . . . . . . . . . ¶¶ 69–74

VI. Proportionality Contentions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ¶¶ 75–82

VII. Constitutionality of Death Penalty Statute . . . . . . . . . . . . . . . . . . . . . . . . . ¶ 83

VIII. Denial of Post–Trial Motions Regarding 1988 Murder Conviction . . . . . . . . . ¶¶ 84–87

IX. Cumulative Error . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ¶¶ 88–90

Appendix A

Appendix B

GOLDEN, Justice.

[¶ 1] In accordance with Wyo. Stat. Ann. § 6–2–103 (Michie 1997), this is an appeal from convictions of capital murder charged under Wyo. Stat. Ann. § 6–2–101(a) (Michie 1997) and a sentence of death imposed under Wyo. Stat. Ann. § 6–2–102 (Michie 1997), following a jury trial and sentencing proceeding. James Martin Harlow, an inmate at the Wyoming State Penitentiary near Rawlins, Wyoming, was charged with and convicted of both premeditated murder and felony murder[1] in the killing of Corporal Wayne Martinez, a prison officer, during an effort by Harlow and two other prisoners to escape from the penitentiary.

[¶ 2] Harlow also was charged with and convicted of one count of attempting to escape from official detention and one count of conspiring to escape from official detention,[2] but those charges are not involved in this appeal.

[¶ 3] The convictions of both premeditated murder and felony murder were merged for purposes of sentencing, and Harlow now appeals from those convictions and the sentence of death that was imposed by the jury. He enumerates thirteen errors in this appeal. The novel contentions he presents concern his claims of error in connection with jury voir dire; the admission of victim impact statements at the sentencing proceeding; and the application of principles of culpability and proportionality to a capital sentence in his case. He raises other issues relating to

---

1. The applicable statute provides:
 § 6–2–101. Murder in the first degree; penalty.
 (a) Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate, any sexual assault, arson, robbery, burglary, escape, resisting arrest, kidnapping or abuse of a child under the age of sixteen (16) years, kills any human being is guilty of murder in the first degree.
 (b) A person convicted of murder in the first degree shall be punished by death or life imprisonment according to law, except that no person shall be subject to the penalty of death for any murder committed before the defendant attained the age of sixteen (16) years.

2. The applicable statutes relating to those charges provide in pertinent part:
 § 6–5–206. Escape from official detention; penalties.
 (a) A person commits a crime if he escapes from official detention. Escape is:

(i) A felony punishable by imprisonment for not more than ten (10) years, if the detention is the result of a conviction for a felony; * * * *
§ 6–1–301. Attempt; renunciation of criminal intention.
(a) A person is guilty of an attempt to commit a crime if:
(i) With the intent to commit the crime, he does any act which is a substantial step towards commission of the crime. A "substantial step" is conduct which is strongly corroborative of the firmness of the person's intention to complete the commission of the crime; * * * *
§ 6–1–303. Conspiracy; renunciation of criminal intention; venue.
(a) A person is guilty of conspiracy to commit a crime if he agrees with one (1) or more persons that they or one (1) or more of them will commit a crime and one (1) or more of them does an overt act to effect the objective of the agreement.

the admission into evidence of his recorded statement made to law enforcement investigators; the assistance given to the trial judge by a death penalty law clerk; the denial of a post-trial evidentiary hearing with respect to a convict who testified at trial; the constitutionality of the death penalty statute; and the denial of a motion to supplement the record with related records in connection with his prior conviction of murder.

[¶ 4] In addition to considering the specific error asserted by Harlow, this court has also considered the punishment. § 6–2–103(c). With regard to the sentence, this court has considered (1) whether the jury imposed the sentence of death under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the jury's finding of an aggravating circumstance and mitigating circumstances is supported by the evidence. § 6–2–103(d)(i) and (ii).

[¶ 5] This court's review of Harlow's enumerated errors and the sentence in light of the entire record, the evidence, and the pertinent legal authority has failed to disclose any reversible error in connection with Harlow's trial and sentencing proceeding. This court, therefore, affirms the judgment and sentence entered in this case. We herewith remand this case to the trial court for the limited purposes of vacating the suspension of the sentence of death and setting of a specific date for execution of that sentence of death.

[¶ 6] From this court's study of death penalty jurisprudence, this court acutely appreciates that a capital case, by its very nature, requires of a reviewing court the most meticulous and thoughtful consideration and deliberation of the issues presented. In fulfilling that requirement in this case, the members of this court have had divergent views concerning the resolution of some of the many difficult issues presented and have expended substantial amounts of time working through those divergent views to achieve agreement on the resolution and the reasoning supporting the resolution of these issues. In light of the requirement of meticulous and thoughtful consideration and deliberation, the working through of divergent views to achieve agreement on resolution of issues, the unique set of appellate responsibilities conferred by the legislature upon this court, the errors enumerated in this appeal, the parties' extensive briefing of the issues underlying these enumerated errors, and the caution that the punishment of death is different, *Furman v. Georgia,* 408 U.S. 238, 306, 92 S.Ct. 2726, 2760, 33 L.Ed.2d 346 (1972) (Stewart, J., concurring), this court has taken considerable time to reach its decision in this case and in another capital case submitted for review before this one and which is also decided today. *See Olsen v. State,* 2003 WY 46, 67 P.3d 536 (2003). Although the time to reach decision has been considerable, it has been necessary and unavoidable for the reasons stated.

## ISSUES

[¶ 7] This statement of the issues is found in Harlow's brief:

### ISSUE ONE

Did the trial court violate Appellant's right to a fair trial and to due process of law under the 6th and 14th Amendments of the United States Constitution by conducting a constitutionally inadequate "challenge for cause" voir dire?

### ISSUE TWO

Did the trial court violate Appellant's right to due process under the 14th Amendment of the United States Constitution when he was denied his state-created liberty interest in "challenges for cause" in a capital case?

### ISSUE THREE

Did the trial court violate Appellant's right to due process and equal protection under the Wyoming Constitution when the trial court denied him his statutory right to challenge for cause any potential juror whose views would "prevent or substantially impair" consideration of a life sentence following a conviction for murder?

### ISSUE FOUR

Did the admission at trial of Appellant's recorded statement, obtained in violation

of his state-created liberty interest in the right to counsel, violate his 14 th Amendment right to due process?

## ISSUE FIVE

Did the admission at trial of Appellant's recorded statement, obtained in violation [of] his right to counsel upon request, violate his rights under Art. 1, §§ 2, 3, 6, and 7 rights of the Wyoming Constitution?

## ISSUE SIX

Did the trial court violate Appellant's rights under the United States and Wyoming Constitutions in admitting victim impact statements at his capital sentencing?

## ISSUE SEVEN

Did the denial of a requested evidentiary hearing regarding inmate Wayne Sanchez and Death Penalty Law Clerk Allen Johnson violate Appellant's rights under the United States and Wyoming Constitutions?

## ISSUE EIGHT

Did this Court's reliance on the partial transcript in *State v. Dowdell,* while denying Appellant's motion for an evidentiary hearing regarding inmate Wayne Sanchez, violate his rights under the United States and Wyoming Constitutions?

## ISSUE NINE

Did Allen Johnson's role during and his influence on Appellant's trial, while being supervised by this Court, violate Appellant's rights under the United States and Wyoming Constitutions?

## ISSUE TEN

Did Appellant's sentence of death violate culpability and proportionality principles under the United States and Wyoming Constitutions?

## ISSUE ELEVEN

Does the Wyoming death penalty statute violate the United States and Wyoming Constitutions?

## ISSUE TWELVE

Did the denial of Appellant's motion to supplement the record with the related records in *James Harlow v. Wyoming* (Sup.Ct.# 98–276) and *James Harlow v. Vance Everett* (Sup.Ct.# 98–272), violate his rights under the United States and Wyoming Constitutions?

## ISSUE THIRTEEN

Did cumulative error violate Appellant's right to due process?

This statement of the issues is found in the State's brief:

I. Whether the trial court conducted constitutionally and statutorily adequate voir dire?

II. Whether the trial court erred in refusing to suppress Appellant's statements to law enforcement?

III. Whether the trial court properly allowed victim impact statements to be read during the penalty phase?

IV. Whether Appellant has shown that the denial of an evidentiary hearing was improper?

V. Whether Appellant's death sentence is proportionate to his level of criminal culpability in the murder of Corporal Wayne Martinez?

VI. Whether Wyo. Stat. § 6–2–102 is unconstitutional?

VII. Whether the post-trial motions filed by Appellant in an effort to supplement the record in this appeal were properly denied?

VIII. Whether cumulative error deprived appellant of a fair trial?

## FACTS

[¶ 8] On the morning of June 26, 1997, Harlow was a maximum-security inmate at the Wyoming State Penitentiary, as were Bryan Collins and Richard Dowdell. The three had decided to escape, and formed a plan to attack the officer in shift command, whom they believed would be a particular sergeant, kill him and commandeer a vehicle.

Harlow knew that Dowdell and Collins were carrying homemade shanks, and because he believed those weapons were insufficient to accomplish their goal, he retrieved a knife that he had previously made.

[¶ 9] While the three convicts were discussing their escape plans, two prison guards were checking bars and windows because of information that had been received of a possible planned escape attempt. In the course of inspecting cells in the maximum-security unit, the officers had found and confiscated contraband from Collins' cell, which included a pipe that resembled a "pot pipe," razor-blades, a lamp that had been altered to create a fire hazard, plants and a miniature graveyard scene. The officers summoned Collins to his cell and Collins and Dowdell arrived shortly thereafter. The officers informed Dowdell that they would be inspecting his cell next, after which Collins and Dowdell returned to the yard and met with Harlow near the tag plant.

[¶ 10] At about 10:30 a.m., the victim, Corporal Wayne Martinez, was sent to shift command in the maximum-security unit to relieve a sergeant while the sergeant escorted another inmate to segregation. The door to shift command did not close after the sergeant's departure, and recognizing that opportunity Harlow, Dowdell and Collins rushed into shift command through the unlocked door. Harlow entered first and struck Corporal Martinez several times. While Harlow held Corporal Martinez, Collins and Dowdell stabbed him and struck him on the head with a fire extinguisher.

[¶ 11] In the course of the attack, Dowdell and Collins inflicted fourteen stab wounds. After Corporal Martinez succumbed, the three convicts fled from shift command and endeavored to climb over the inner perimeter fence. Dowdell and Collins succeeded in that attempt, but Harlow did not get over the fence because of severe injury to his hands and arms received from the razor wire. Harlow then returned to the central rotunda of the maximum-security unit, threw away the shank he had been carrying and remained there until correctional officers apprehended him.

[¶ 12] Emergency medical personnel went to the prison and transported Corporal Martinez to the local hospital. Corporal Martinez was pronounced dead at the hospital after attempts to resuscitate him were ineffective. An autopsy, which was performed the following day, identified the cause of death as a stab wound to his right lung. The three inmates were also taken to the hospital, and Harlow was treated for the cuts that he had sustained in the escape attempt.

[¶ 13] Two law enforcement officers, a deputy sheriff and a special agent of the Division of Criminal Investigation, were assigned to interview Harlow, Collins and Dowdell with respect to the murder of Corporal Martinez. The agent and the deputy sheriff first encountered Harlow at the hospital on the evening of June 26, but he declined to speak with them at that time. On July 3, 1997, the agent and the deputy sheriff met with Harlow at the penitentiary just long enough to read him his rights with respect to making any statement. Harlow refused to be interviewed without an attorney, and the investigators terminated that contact. Several days later, on July 7, 1997, Harlow asked to meet with the agent and the deputy sheriff, and he answered questions over the course of seventy-one minutes.

[¶ 14] The criminal information that charged Harlow with one count of first-degree premeditated murder, one count of first-degree felony murder, one count of attempting to escape from official detention, and one count of conspiring to escape from official detention was filed on July 10, 1997. Harlow's trial began on October 5, 1998, and the jury returned verdicts of guilty on all four counts on October 27, 1998. At his sentencing hearing, Harlow presented mitigating evidence of his youth when first imprisoned for life, an unstable family background that included drug, alcohol, and sexual abuse, and his positive character traits. On November 5, 1998, the jury returned a sentence of death. The judgment, which sentenced Harlow to death and suspended that sentence pending appeal, was entered in the district court on December 7, 1998. Additional facts relating to the specific issues will be set forth

in connection with the discussion of the issues.

## DISCUSSION

### I. Voir Dire

[¶ 15] The first three issues that Harlow presents are all concerned with the voir dire examination of the jury panel. Harlow asserts that the trial court violated his right to due process and his right to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution as well as his rights to due process and equal protection under the Constitution of the State of Wyoming. In presenting this argument, Harlow seeks to tease out of the opinions of the United States Supreme Court in *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985), and *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), talismanic language for conducting voir dire in a capital case. In *Witt,* the United States Supreme Court adopted as the appropriate standard for excluding a prospective juror from a capital case because of his or her views on capital punishment the proposition of whether the individual's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt,* 469 U.S. at 424, 105 S.Ct. at 852. Subsequently, the United States Supreme Court clarified the *Witt* opinion in *Morgan.* In the *Morgan* case, the United States Supreme Court reversed a capital sentence because the trial court had refused to ask potential jurors, "If you found [the defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?" *Morgan,* 504 U.S. at 723, 112 S.Ct. at 2226. Instead, the trial court had posed this question to the venire, "Would you follow my instructions on the law even though you may not agree?" The United States Supreme Court held the question asked to be inadequate to reveal potential jurors who had refused to consider mitigating circumstances. The United States Supreme Court explained

A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views. If even one such juror is empanelled and the death sentence is imposed, the State is disentitled to execute the sentence.

*Id.* at 729, 112 S.Ct. at 2229–30. Subsequently, the United States Supreme Court articulated the goal, saying, "[p]etitioner was entitled, upon his request, to inquiry discerning those jurors who, even prior to the State's case in chief, had predetermined the terminating issue of his trial, that being whether to impose the death penalty." *Id.* at 736, 112 S.Ct. at 2233.

[¶ 16] In Wyoming, the legislature clearly has adopted the *Witt* proposition in Wyo. Stat. Ann. § 7–11–105(a)(iii) (Michie 1997), which states:

(a) The following is good cause for challenge to any person called as a juror in a criminal case:

* * * *

(iii) In a case in which the death penalty may be imposed, he states that his views on capital punishment would prevent or substantially impair performance of his duties as a juror in accordance with his oath or affirmation and the instructions of the court[.]

[¶ 17] The gravamen of Harlow's contentions relative to the voir dire examination of the jury is that the trial court did not ask prospective jurors whether they held views that would "prevent or substantially impair" them from sentencing him to life imprisonment in the event of a conviction. Harlow presented the issue several months before trial in a "Motion for Legal Standard/Definition by Court of Death Qualification." In that motion, Harlow invoked *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20

L.Ed.2d 776 (1968), which he contended recognized error for the dismissal of veniremen mainly because they do not believe in capital punishment and acknowledged that they have conscientious or religious scruples against the infliction of the death penalty. On the same day, Harlow submitted a motion to remove for cause jurors who will automatically vote for death in which he invoked *Morgan* to support an argument that jurors also should be asked whether they automatically vote for the death penalty in every case. In substance, Harlow was asking for the question that the trial court posed using substantially the language from *Morgan*.

[¶ 18] Subsequently, at a pretrial motion hearing, Harlow's counsel contended that the law did not deny to the prosecution the ability to challenge for cause those who say they would never vote to impose the death penalty, but that the prosecution could not dismiss veniremen merely because they did not believe in capital punishment. The response was that Harlow simply was demanding that the State be ordered to comply with § 7–11–105(a)(iii). At the continuation of the hearing, Harlow also requested that the trial court enter an order stating that anybody who automatically would vote for the death penalty under these particular sets of circumstances is not qualified to serve.

[¶ 19] When jury selection for Harlow's trial began, defense counsel repeatedly violated W.R.Cr.P. 24 and also a prior order of the trial court by asking questions that the trial court deemed inappropriate. Counsel persisted despite repeated warnings; and after counsel refused to stop talking while making his presentation despite caution from the trial court to stop, the trial court announced that it would conduct voir dire. The trial court then denied Harlow's motion for a mistrial and noted that the jurors were questioned specifically about attitudes regarding the death penalty and were asked about their inclination to automatically impose the death penalty in accordance with the question approved in *Morgan*. The trial court also pointed out that jurors were asked the *Witt* question ascertaining whether the jury would never vote for the death penalty.

[¶ 20] We review the trial court's conduct of jury voir dire under an abuse of discretion standard. *Vit v. State*, 909 P.2d 953, 960 (Wyo.1996). We have said with respect to our examination of judicial discretion that "[w]e perceive the core of our inquiry as reaching the question of reasonableness of the choice made by the trial court." *Vaughn v. State*, 962 P.2d 149, 151 (Wyo. 1998). In *Vaughn*, we reaffirmed our adoption in *Martin v. State*, 720 P.2d 894, 897 (Wyo.1986), of the following standard:

Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. *Byerly v. Madsen*, 41 Wash.App. 495, 704 P.2d 1236 (1985).

*Vaughn*, 962 P.2d at 151.

[¶ 21] In analyzing Harlow's contentions, we are persuaded that the goal of the voir dire with respect to establishing a challenge for cause as it is articulated in § 7–11–105(a)(iii) is to identify those jurors at both ends of the spectrum. According to the *Witt* standard, those jurors who would never impose a death penalty presumably would insert "yes" to the question captured in the statute. The effort also would be made to eliminate jurors who would always vote for the death penalty in accordance with the *Morgan* standard. Harlow contends that in making the latter endeavor, the trial court should invoke the "prevent or substantially impair" language even though the question is more direct than the statute or *Witt* requires. Harlow contends that *Morgan* demands that his position be adopted, but in our view that claim misses the essential point found in *Morgan*. We prefer a more pragmatic analysis that is articulated in opinions from two United States Courts of Appeal.

[¶ 22] In *McQueen v. Scroggy*, 99 F.3d 1302, 1329–30 (6th Cir.1996), the United States Court of Appeals for the Sixth Circuit upheld a capital sentence in an instance in which the appellant claimed he had not been allowed to question potential jurors adequately on whether they would impose the death sentence in every circumstance.

*McQueen* determined that error occurred when the trial court refused to ask questions proposed by the trial counsel for his co-defendant: "Would you inflict the death penalty in all murders?"; "In what kinds of cases do you think the death penalty is warranted?"; and "Do you believe the death penalty is a deterrent?" *Id.* at 1329. The trial court instead asked each juror whether the juror could accept and impose any penalty within the statutorily specified range in the event of conviction. The United States Court of Appeals for the Sixth Circuit said:

> A person who answers that he will consider every possible penalty . . . is by virtue of that answer disclaiming the intent to impose the death penalty in every case. There are no magic words in these circumstances. Here the questions and answers disclose that the jurors were ready to consider each of the penalties that could be imposed, and that they were not predisposed to give only death or to act with leniency. It would be a game of semantics, not law, to conclude that the failure to phrase a question in a specific way is fatal where other questions are equally illuminating.

*Id.* at 1330.

[¶ 23] Subsequently, the United States Court of Appeals for the Tenth Circuit arrived at a similar conclusion in *United States v. McVeigh,* 153 F.3d 1166, 1205–06 (10th Cir.1998). McVeigh argued that the trial court unconstitutionally constrained him in examining the venire and prevented him from learning whether individual jurors automatically would vote for death upon a conviction. The United States Court of Appeals for the Tenth Circuit held that the trial judge properly excluded this question:

> If the allegations did—if you served on the jury and heard all the evidence in the guilty/innocence part of the trial and the jury voted that Mr. McVeigh was guilty, would you feel in that instance that the death penalty automatically should apply?

The court reasoned that *"Morgan* does not require courts to permit improperly phrased questions, such as questions that misstate the law or confuse the jurors." *Id.* at 1207. The court went on to say:

Further, the question is susceptible of an interpretation asking the juror how she would vote on the evidence presented at trial. That is a question broader than the scope of inquiry *Morgan* requires. The question approved in *Morgan* was the following: "If you found [the defendant] guilty, would you automatically vote to impose the death penalty *no matter what the facts are?"* *Morgan,* 504 U.S. at 723, 112 S.Ct. 2222, 119 L.Ed.2d 492 (emphasis added). The Supreme Court felt such a question was necessary to identify jurors who would always impose the death penalty upon conviction of a capital offense "regardless of the facts and circumstances of conviction." *Id.* at 735, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492.

*McVeigh,* 153 F.3d at 1207.

[¶ 24] The record in this case demonstrates that the trial court asked prospective jurors whether their views would "always require" them to impose the death penalty following a conviction for murder. The question asked is calculated to elicit the same information as the question required by the United States Supreme Court in *Morgan,* "If you found [the defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?" Furthermore, the trial court complied with the requirements of the Wyoming statute that adopts the rule of *Witt.* We hold that the voir dire questions posed by the trial court were sufficiently similar to the question approved in *Morgan* as to be "equally illuminating." We do not perceive that it is necessary to fetter the discretion of the trial court by structuring any further mandatory phrasing of questions of the veniremen. Certainly, in the exercise of its discretion, the trial court is able to form a conclusion as to how effective the communication is between counsel or the court and the potential jurors being questioned, and we perceive no abuse of discretion in what was accomplished in this case.

## II. Denial of Motion to Suppress

[¶ 25] In the fourth and fifth issues, Harlow complains of the failure of the trial court to suppress his July 7, 1997, statement to the investigators on the ground that it was invol-

untary. Harlow contends that the investigators took the statement in violation of his constitutional and statutory rights because the investigators did not provide him an attorney after he invoked his right to counsel; the investigators took his statement, even though he had requested an attorney but had not yet been provided one; and the prosecutor violated Rule 3.8 of the Rules of Professional Conduct for Attorneys at Law (W.R.P.C.) by counseling the investigators without assuring that Harlow was advised of his rights and the procedure for obtaining counsel. The State's position is that the investigators honored Harlow's right to refuse to speak without representation, but Harlow waived that right when he initiated the conversation on July 7.

[¶ 26] The standard for reviewing a ruling on a motion to suppress is:

> We review de novo a district court's ruling on a motion to suppress for involuntariness. *Stone v. State*, 745 P.2d 1344, 1348 (Wyo.1987) (citing *Miller v. Fenton*, 474 U.S. 104, 104, 106 S.Ct. 445, 446, 88 L.Ed.2d 405 (1985)). It is well established that when reviewing a district court's ruling on a motion to suppress we do not disturb findings on factual issues made by the district court unless they are clearly erroneous. *Bravo v. State*, 897 P.2d 1303, 1305 (Wyo.1995). Because the district court at the suppression hearing has the opportunity to assess the credibility of the witnesses and the weight to be given the evidence and to make the necessary inferences, deductions and conclusions, we view the evidence in the light most favorable to the district court's determination. *Wilson .v. State*, 874 P.2d 215, 218 (Wyo.1994).

*State v. Evans*, 944 P.2d 1120, 1124 (Wyo. 1997).

[¶ 27] In making this argument, Harlow relies upon Wyo. Stat. Ann. § 7–6–105(a) (Michie 1997), which provides:

> A needy person who is being interrogated by law enforcement personnel for a serious crime, or who is a probationer or parolee, shall be informed of his right to be represented by an attorney at public expense. If the person being interrogated does not have an attorney and wishes to

have the services of an attorney, he shall be provided the opportunity to contact the nearest public defender.

Harlow argues that, when he refused on July 3 to speak with investigators without counsel, his action constituted a request for representation by a public defender. The investigators, concededly, took no steps to ensure that such representation was provided, and Harlow reasons that they denied him his rights under § 7–6–105(a).

[¶ 28] Each of the two sentences in the statute conveys a separate right to individuals who are "being interrogated" by law enforcement personnel. The statute is not applicable unless Harlow was a "needy person" who was "being interrogated." The resolution of these claims requires a determination as to whether Harlow was "being interrogated" at the time that he insists the statute should have been invoked.

[¶ 29] The United States Supreme Court has said that interrogation includes "words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 302, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297 (1980). Some eight years later we adopted that definition:

> Interrogation reflects a measure of compulsion above and beyond that inherent in custody itself. *Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). The definition of interrogation includes only words or actions by police officers that they should have known were reasonably likely to elicit an incriminating response. *Rhode Island v. Innis*, supra, 446 U.S. at 302, 100 S.Ct. at 1690.

*Griffin v. State*, 749 P.2d 246, 253–54 (Wyo. 1988).

[¶ 30] The record reflects three contacts between Harlow and the investigators. The first, on June 26, was very brief. As soon as the DCI agent identified herself, Harlow stated his unwillingness to converse, and the investigators left. The next contact occurred on July 3, when the DCI agent informed Harlow of his rights, and asked him if he

would talk with her. On that occasion, Harlow declined to talk without an attorney, and the DCI agent terminated the interview with no further questions or statements. As interrogation is defined, it is clear that Harlow was not interrogated on June 26 or July 3. Therefore, his rights under § 7–6–105(a) were not invoked on either of those dates.

[¶ 31] On July 7, the DCI agent and the deputy sheriff were at the prison to interview other individuals, and they were advised by prison personnel that Harlow wished to speak with them. The investigators did not advise Harlow of his rights again on July 7, but they claimed they did ensure that he recalled and understood those rights. The State submits that by initiating a conversation with the investigators, after he had asserted his right to counsel, Harlow waived that right, and consented to being interrogated without representation by counsel.

[¶ 32] Under the Constitution of the United States, the United States Supreme Court has established a two-part inquiry to test whether a statement such as the one Harlow made is voluntary. *Oregon v. Bradshaw*, 462 U.S. 1039, 1045–46, 103 S.Ct. 2830, 2834–35, 77 L.Ed.2d 405 (1983). In *Bradshaw* the Court said that a statement made after the accused expresses a demand for representation by counsel is voluntary if the accused initiates a conversation or dialogue with the police and, under the totality of the circumstances, waives the right to silence and the right to counsel. *Id.* In *Wells v. State*, 846 P.2d 589, 594 (Wyo.1992), this court invoked the *Bradshaw* test. We ruled that Wells' statement was voluntary when the record demonstrated that he had been read his rights and had requested an attorney, but initiated a conversation and uttered incriminating statements while riding in an automobile with police officers. *Id.*

[¶ 33] We hold that Harlow's statement to the investigators satisfies the test for voluntariness set forth in *Bradshaw*. Harlow was informed of his rights, and after requesting counsel he initiated a conversation with law enforcement personnel. By doing so Harlow waived his rights to silence and representation. *See also Ramos v. State*, 806 P.2d 822, 828 (Wyo.1991) ("Once the individual requests to be represented by counsel, the police must cease any interrogation until the accused is represented by counsel or until he waives his constitutional rights.") Therefore, although the July 7 contact was an interrogation to which § 7–6–105(a) would apply, we hold that Harlow waived his right to representation and his statement was voluntary.

[¶ 34] Harlow also contends the trial court should have suppressed his statement because the prosecutor violated W.R.P.C. 3.8, which reads:

The prosecutor in a criminal case shall:

\* \* \* \*

(b) prior to interviewing an accused or prior to counseling a law enforcement officer with respect to interviewing an accused, make reasonable efforts to assure that the accused has been advised of the right to, and the procedure for obtaining, counsel and has been given reasonable opportunity to obtain counsel[.]

[¶ 35] Harlow argues that the prosecutor violated this rule when he met with the investigating officers but made no efforts to assure that Harlow was advised of his right to counsel or had a reasonable opportunity to obtain counsel. He contends that the rule has the force of an enacted statute due to Wyo. Stat. Ann. § 5–2–113 (Michie 1997):

It shall be the duty of the supreme court, from time to time, to prescribe rules of practice for said court, not inconsistent with the constitution or laws of this state, and when said rules are adopted by said court, the same shall be as binding upon the court, and the attorneys thereof, and the parties having business therein as though the same were enactments of the legislature of the state.

The State contends that Harlow's argument premised upon W.R.P.C. 3.8 is unavailing for two reasons: 1) the record does not show that any violation of the rule actually occurred; and 2) the W.R.P.C. do not provide for the suppression sanction that Harlow seeks, even if there was a violation.

[¶ 36] There is no violation of W.R.P.C. 3.8(b) unless the prosecutor interviews an accused or counsels law enforcement personnel with respect to interviewing

an accused. Harlow does not contend that the prosecutor interviewed him. He does contend, however, that the prosecutor counseled the investigating agents with respect to interviewing him. Our careful search of the record leads us to conclude that the prosecutor, or members of his staff, did counsel the investigating officers with respect to conducting interviews of Harlow and other individuals. During the hearing on Harlow's suppression motion, the following exchange took place while the prosecutor conducted direct examination of the deputy sheriff:

Q. Okay. After that night, did that—the evening of the 26th of June, did you and [the DCI agent] continue to interview persons other than suspects in this case?

A. We continued to work on the case, yes.

Q. And did [the DCI agent] assist you straight through your investigation or were there interruptions?

A. She—when it came to interviewing the inmate suspects, she assisted me in all interviews.

Q. Okay. You travel together to and from the Penitentiary?

A. Most usually, yes.

Q. Most usually. And you made arrangements or a plan—or excuse me. Who planned out your investigative day?

A. Usually through meeting with your office.

Given the deputy sheriff's testimony that the prosecutor's office helped plan daily investigations, we may reasonably infer that the planning included plans for the anticipated interview of Harlow.

■ [¶ 37] Still we agree with the State's argument that a violation of W.R.P.C. 3.8(b) does not require a holding that Harlow's statement was inadmissible. Harlow is correct in contending that § 5–2–113 affords the force of law to rules of practice promulgated by this Court. That proposition does not, however, lead to the result Harlow demands. Instead, the sanction is prescribed within the text of the rules themselves. The provisions of the rules describing their scope state in relevant part in paragraph [6]:

Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies.... The fact that a Rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule. Accordingly, nothing in the Rules should be deemed to augment any substantive legal duty of lawyers or the extra-disciplinary consequences of violating such a duty.

In light of the language in paragraph six, we hold that a violation of the Rules of Professional Conduct on the part of the prosecutor does not render Harlow's statement to the investigators involuntary or require its suppression.

*III. Victim Impact Testimony*

[¶ 38] The facts pertinent to Harlow's sixth issue are these. Before trial, Harlow moved to prevent the prosecution's introduction of victim impact evidence during the sentencing phase of the trial. He asserted that Wyoming's death penalty statute does not authorize the sentencer (here, the jury) to consider victim impact in its determination of the appropriate sentence. The prosecution opposed Harlow's motion. While recognizing that the death penalty statute does not explicitly authorize the introduction of victim impact evidence during the sentencing phase, the prosecution maintained that the general language in § 6–2–102(c), authorizing the jury to hear evidence as to any matter that the trial judge deems relevant to a determination of the sentence, could be construed to cover the matter of victim impact. Although Harlow remained steadfast in his position, he requested that the trial court review before trial all proposed victim impact evidence offered by the prosecution if the trial court denied his motion. Harlow and the prosecution continued to hold their respective positions on this point in subsequent pretrial hearings. On June 12, 1998, the trial court

denied Harlow's motion to prevent the introduction of victim impact evidence. In its ruling, the trial court permitted the prosecution to offer a victim impact statement from one member of the victim's family and required the prosecution to submit a writing of that statement to the court for review in advance of trial. The prosecution submitted to the trial court written statements from the father, the wife, and the father-in-law of the victim. Harlow then moved the trial court to delete those parts of the statements which expressed that the appropriate penalty should be death. The trial court granted Harlow's motion. The prosecution then moved the trial court to permit the prosecution to introduce the revised statements of the victim's wife and father. The trial court apparently granted the prosecution's motion.

[¶ 39] During the prosecution's case-in-chief in the sentencing phase of the trial, the prosecution presented witness Ranae Baldes, the Hot Springs County Victim/Witness Coordinator, who read the revised statements of the victim's wife and father. A copy of the testimony of Ms. Baldes is reproduced in Appendix A to this opinion.

[¶ 40] On appeal, Harlow reiterates the legal position he asserted below, claiming that the trial court erred in permitting the introduction of this evidence. In response, the State reiterates the legal position which the prosecution maintained below, claiming that the trial court's ruling was correct. Succinctly stated, Harlow asserts, and the State disagrees, that neither the death penalty statute, § 6-2-102, nor the general victim impact statute, §§ 7-21-101 through 103, authorize the use of victim impact evidence during capital sentencing; and that the trial court's ruling violated Harlow's legislatively-created liberty interest in capital sentencing procedures in contravention of Article 1, Section 6, of the Wyoming Constitution, and the Due Process clause of the Fourteenth Amendment of the United States Constitution.

[¶ 41] Our decision today in *Olsen v. State*, 2003 WY 46, ¶ 164, 67 P.3d 536 on this same question is dispositive. In that case we held that neither the death penalty statute nor the general victim impact statute authorized the introduction of victim impact evidence during capital sentencing and, therefore, the trial court erred in allowing its introduction.[3] We recognized, however, that

---

**3.** In *Olsen* we noted that in the aftermath of *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), which held that the Eighth Amendment of the United States Constitution did not bar victim impact evidence in the penalty phase of a capital case if a state chose to authorize it, the legislatures of some twelve states amended their capital sentencing statutes to expressly authorize the admission of victim impact evidence. *Olsen*, ¶ 174 n. 14. As examples of such express statutory authorization, we noted the Pennsylvania and Florida statutes. Pennsylvania's statute reads in pertinent part:

(2) In the sentencing hearing, evidence concerning the victim and the impact that the death of the victim has had on the family of the victim is admissible. Additionally, evidence may be presented as to any other matter that the court deems relevant and admissible on the question of the sentence to be imposed. Evidence shall include matters relating to any of the aggravating or mitigating circumstances specified in subsections (d) and (e), and information concerning the victim and the impact that the death of the victim has had on the family of the victim. Evidence of aggravating circumstances shall be limited to those circumstances specified in subsection (d).

42 Pa.C.S.A. § 9711(a)(2) (enacted October 11, 1995, to be effective sixty days thereafter). Florida's statute reads in pertinent part:

Once the prosecution has provided evidence of the existence of one or more aggravating circumstances as described in subsection (5), the prosecution may introduce, and subsequently argue, victim impact evidence. Such evidence shall be designed to demonstrate the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death. Characterizations and opinions about the crime, the defendant, and the appropriate sentence shall not be permitted as a part of victim impact evidence. Fla. Stat. Ann. § 921.141(7) (West 2001).

In *Olsen* we also noted that the United States Congress had made victim impact evidence a subject of statute, as 18 U.S.C. 3593(a) provides that in a death penalty case the prosecution shall give notice that it is seeking a death sentence based upon certain aggravating factors which may include factors concerning the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information.

18 U.S.C. § 3593(c). The federal statute goes on to provide that

such error is usually subject to our harmless error analysis. *Id.* at ¶ 176. In *Olsen,* we found such analysis unnecessary, however, because we reversed on other errors and remanded for new sentencing. *Id.* In the instant case, we have found no other errors, so it is necessary that we consider undertaking our harmless error analysis on this point.

[¶ 42] Harlow has recognized that a harmless error analysis probably applies to the error in question. At page 173 of his main brief, he states, "[t]he State bears the burden of proving the trial court's constitutional error harmless beyond a reasonable doubt," citing *Chapman v. California,* 386 U.S. 18, 23–24, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967). Moreover, at page one of his reply brief, he emphasizes that the State in its brief failed to make a harmless error argument on any of the constitutional errors asserted by him, which would include, of course, the victim impact evidence issue. Harlow notes that the State's failure in this regard "defies this Court's requirement that on direct appeal the State must demonstrate that the constitutional errors below were harmless beyond a reasonable doubt. *Gentry v. State,* 806 P.2d 1269, 1272 (Wyo.1991)."

[¶ 43] It was in *Campbell v. State,* 589 P.2d 358, 368 (Wyo.1979), that this court adopted the United States Supreme Court's *Chapman* harmless error standard for constitutional questions under either the federal or Wyoming constitutions. Under that standard, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828. Since *Chapman* issued, the United States Supreme Court's consistent position has been that a reviewing court's duty is to consider the trial record as a whole and ignore errors that are harmless, including most constitutional violations. *See, Rose v. Clark,* 478 U.S. 570, 576–77, 106 S.Ct.

3101, 3105, 92 L.Ed.2d 460 (1986); *United States v. Hasting,* 461 U.S. 499, 509–10, 103 S.Ct. 1974, 1980–81, 76 L.Ed.2d 96 (1983); 5 Wayne R. LaFave, Jerold H. Israel, and Nancy J. King, *Criminal Procedure* § 27.6(d), at 948–50 (2d ed.1999); *and see, Barclay v. Florida,* 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983) (specifically approving the application of harmless error analysis to death sentences where trial judge had considered an invalid aggravating circumstance). In *Grossman v. State,* 525 So.2d 833, 842–45 (Fla.1988), after careful consideration, the Florida Supreme Court held that "erroneous introduction of victim impact evidence is subject to harmless error analysis on a case-by-case basis." *See also, State v. Payne,* 791 S.W.2d 10, 19 (Tenn. 1990).

[¶ 44] However, a threshold question we must answer is whether the State's failure to argue harmless error in connection with the victim impact evidence issue requires this Court's decision that the State has not carried its burden to demonstrate that the error was harmless beyond a reasonable doubt. *See, e.g., Stone v. State,* 548 So.2d 307, 308–09 (Fla.App.1989). As appealing as that course of action may appear at first glance, well-respected legal authority counsels otherwise. We are informed that

> Considerable attention has been given ... to the allocation of the burden of showing potential prejudice. In *Kotteakos* [*v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)], the Supreme Court rejected the idea of uniformly placing the burden on either party.... Chief Justice Traynor of the California Supreme Court suggested that the entire issue of presumptions and burdens was largely meaningless in the harmless error context. [R. Traynor, *The Riddle of Harmless Error,* 25–26 (1970)] In evaluating what effect, if

[a]t the sentencing hearing, information may be presented as to any matter relevant to the sentence.... The government may present any information relevant to an aggravating factor for which notice has been provided under subsection (a).
*Id.* (In *United States v. McVeigh,* 944 F.Supp. 1478, 1491 (D.Colo.1996), *affirmed* 153 F.3d 1166 (10th Cir.1998), Judge Richard Matsch said

of victim impact evidence that it "is the most problematic of all of the aggravating factors and may present the greatest difficulty in determining the nature and scope of the 'information' to be considered. Congress expressly provided for victim impact consideration in the Death Penalty statute but it did not put any limits on what can be considered.") *Olsen,* ¶ 174.

any, an error had on the jury's verdict, the appellate court may look only to the record before it. The function of a party carrying the burden is simply to suggest, in light of that record, how prejudice may or may not have occurred. At that point, the court makes its own assessment as to what degree of likelihood exists as to that prejudicial or nonprejudical impact and then applies to that assessment the likelihood-standard of the particular jurisdiction.

5 LaFave, et al., *supra,* § 27.6(b), at 942 (footnotes omitted).

[¶ 45] In *O'Neal v. McAninch,* 513 U.S. 432, 437, 115 S.Ct. 992, 995, 130 L.Ed.2d 947 (1995), Justice Breyer, writing for the majority, quoted with approval Chief Justice Traynor's comments on the meaninglessness of allocating a "burden of proof" in this context. Another scholar has written:

> There is a good deal of talk in the cases ... about whether error is or is not presumed to have been harmful, and where the burden lies on this point. It is said ... that if the error was fundamental, or of such a character as would normally prejudice rights, the burden is on the prosecution to demonstrate its harmlessness. The value of such formulations, and of nice allocations of burden, seems highly doubtful, and contrary to the spirit of the Court's warning, in the *Kotteakos* case, "against attempting to generalize broadly, by presumption or otherwise." 3A

Charles Alan Wright, *Federal Practice and Procedure* § 854, at 304–05 (1982) (footnotes omitted). Several of the United States Circuit Courts of Appeal have concluded that a reviewing court has discretion to overlook the government's failure to argue harmlessness in an appropriate case. *See, e.g., United States v. Samaniego,* 187 F.3d 1222, 1224–26 (10th Cir.1999); *United States v. Torrez–Ortega,* 184 F.3d 1128, 1136 (10th Cir.1999); *United States v. Pryce,* 938 F.2d 1343, 1347–48 (D.C.Cir. 1991); and *United States v. Giovannetti,* 928 F.2d 225, 227 (7th Cir.1991). In deciding whether to exercise that discretion, a reviewing court may consider such factors as the length and complexity of the record, whether the harmlessness of the error is certain or debatable, and whether a reversal would result in protracted, costly, and futile proceedings in the trial court. *Samaniego,* 187 F.3d at 1224–25 (citing *Giovannetti,* 928 F.2d at 227).

[¶ 46] We have applied these factors to the instant case. The record of the sentencing phase consists of approximately 753 pages. The State's opening statement runs about 6 pages; the defense's runs about 21 pages. The State's evidentiary case-in-chief runs about 156 pages; the defense's evidentiary case runs about 433 pages. The State's closing and rebuttal closing arguments total 54 pages; the defense's closing argument runs 38 pages. We find that the sentencing phase record is neither lengthy nor complex. We find that the harmlessness of the error is fairly certain, considering all of the evidence presented, the jury instructions given, the length and content of the two victim impact statements in question (three pages of the father's statement and two pages of the wife's statement), and the opening statements and closing arguments of counsel, including those portions in which reference is made to the victim impact evidence. Finally, a reversal and remand would result in a protracted, costly, and ultimately futile (for Harlow) re-sentencing proceeding in the trial court. For these reasons, we hold that this is an appropriate case in which to undertake harmless error review on the victim impact evidence error. We now move to that review.

[¶ 47] The *Chapman* standard requires the appellate court to be convinced beyond a reasonable doubt no reasonable possibility exists that the error contributed to the jury's determination. *Chapman,* 386 U.S. at 23–26, 87 S.Ct. at 827–29. In the instant case, then, the specific question is whether this Court is convinced beyond a reasonable doubt no reasonable possibility exists that the statements of Corporal Martinez's father and wife and the prosecutor's comments on them in his opening statement and closing arguments contributed to the jury's determination that the appropriate penalty for Harlow is death.

[¶ 48] In considering this specific question concerning whether the victim im-

pact evidence and the prosecutor's comments about it contributed to the jury's determination that the appropriate penalty for Harlow is death, we must bear in mind the particular concerns about such evidence and comments which the United States Supreme Court identified in *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987); *South Carolina v. Gathers,* 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), and *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). For it will be those particular concerns against which we shall measure the victim impact evidence and the prosecutor's comments heard by the jury in this case. In *Booth,* the victim impact statement contained two types of information: (1) information about the personal qualities of the victims and the emotional effect of the victims' deaths on the victims' family members, and (2) information about the family members' opinions and characterizations of the crime and the defendant. *Booth,* 482 U.S. at 502, 107 S.Ct. at 2533. In *Gathers,* the prosecutor's closing argument included a reading from a religious tract carried by the victim and comments about the victim's personal qualities which the prosecutor inferred from that religious tract and from the voter's registration card also carried by the victim. *Gathers,* 490 U.S. at 808–10, 109 S.Ct. at 2209–10. In *Payne,* in which a young mother and her baby daughter were murdered and her young son grievously injured, the grandmother testified about how much the surviving young son missed his mother and baby sister. *Payne,* 501 U.S. at 814–15, 111 S.Ct. at 2603. Also in *Payne,* the prosecutor's closing argument included comment about the effects of the crimes upon family members. *Id.* at 815–16, 111 S.Ct. at 2603. In *Booth,* the Court was concerned that introduction of the first type of information, namely, the victim's personal qualities and the emotional effect of the crime upon family members, runs the risk of diverting the jury's focus from the defendant's characteristics and record and the circumstances of the crime. *Booth,* 482 U.S. at 504–05, 107 S.Ct. at 2533–34. With regard to the second type of information, namely, the family members' opinions and characterizations of the crimes and the defendant, the *Booth* Court was con-

cerned that such information would "inflame the jury and divert it from deciding the [sentence] on the relevant evidence concerning the crime and the defendant." *Id.* at 508, 107 S.Ct. at 2536. The *Booth* Court acknowledged, however, "there is no doubt that jurors generally are aware of these feelings [of the victim's family members about the crime and the defendant]." *Id.* Although *Payne* overruled *Booth* and *Gathers,* the Court acknowledged that if the state-allowed victim impact evidence is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment of the United States Constitution provides a mechanism for relief. *Payne,* 501 U.S. at 825, 111 S.Ct. at 2608.

[¶ 49] Based upon this succinct review of *Booth, Gathers,* and *Payne,* we believe that our assessment of the victim impact statements and prosecutor's comments about them in this case must carefully scrutinize whether the information of Corporal Martinez's personal qualities and the emotional effect of the crime on the family members, as well as the prosecutor's comments about that information, inflamed the jury and was so unduly prejudicial that it rendered the trial fundamentally unfair or diverted the jury's focus from Harlow's characteristics and record and the circumstances of the crime. With this standard in mind, we now turn to the victim impact statements and the prosecutor's comments about them.

[¶ 50] The prosecutor's opening statement to the jury in the sentencing phase of the trial consists of 140 lines in six pages of the record. Of those 140 lines, only four lines toward the end of the statement refer to victim impact evidence:

> Near the end of the State's case or at the end of the State's case today or tomorrow, you'll hear what the law allows regarding victim impact evidence. A statement, to be read to you, is what the law allows, and you'll hear that.

Defense counsel's opening statement consists of 507 lines in twenty pages of the record. Of those 507 lines, only five lines, appearing at a half-way point in the opening statement, refer to victim impact evidence:

You know, we understand – I certainly understand the loss of the Martinez family and, I mean, you know, he was a wonderful, good man. Everything that I've ever read about him, he was a fine person. You know, he had a family. He had children. He had a wife. And he didn't deserve to die.

[¶ 51] Following the opening statements, the prosecution presented its case-in-chief. In the record, the prosecution's evidentiary presentation runs about 156 pages. The prosecution's evidence of the three statutory aggravating circumstances, upon which it was relying to secure the death penalty, was presented before the victim impact evidence. As we related earlier, the prosecutor introduced the victim impact evidence, consisting of the written statements of Corporal Martinez's father and wife, through the reading of those statements by Ranae Baldes, the Hot Springs County Victim/Witness Coordinator. After that reading, the prosecution rested. As we read the victim impact statements in question, we find that they contain information about Corporal Martinez's personal qualities and the emotional effect of his death on his family members, but do not contain information about the family members' opinions and characterizations of the crime and defendant Harlow.

[¶ 52] The prosecutor's principal closing argument spans about 38 pages of the record and contains about 900 lines. Of those 900 lines, a mere eleven lines refer to victim impact. Four lines into his argument and again at ninety lines into his argument, he said, "Don't forget the victim." About 710 lines later, he said, "I say to you again, don't forget Wayne Martinez." And, about 42 lines later, he said,

What I can say about Corporal Martinez I've said, and was said in those statements and that is that his life had value, just as they are arguing to you Mr. Harlow's life has value.

Now he has a dad and a wife who miss him. You heard that; that he can't hear him sing his songs; that they, his children, don't have a father; that his wife has no husband. Don't forget the victim.

Defense counsel's closing argument, which covers about thirty-eight pages, or 950 lines, of the record made this reference at a point about 135 lines into argument,

I don't want to ever minimize, although I'm going to talk a lot about Jimmy [Harlow] and his family, I don't want to ever minimize how difficult it is for the Martinez family. You know, there is [sic] children involved there, and that loss can never be replaced.

[¶ 53] In the prosecutor's rebuttal closing argument, which covers about eighteen pages, or 450 lines, of the record, about thirteen lines refer to victim impact. The first reference appears mid-way into the rebuttal, when the prosecutor comments:

The individual respect or not respect for Mr. Harlow's humanity is no more or less the victim clearly had his own value to society and his own humanity that he's lost to us as well.

The second reference appears about twenty lines before the end of the rebuttal, when the prosecutor says,

Act not, I urge you, out of revenge or retribution. I ask you instead to remember there is a victim here and a victim's family, and all the things that you read about him in the exhibit—or heard, excuse me, from the Victim Impact Statement about how much he loved his family, he helped his father even get through hard times; that he had a value to society of his own; that it is lawful and appropriate to consider, and I urge you to consider, do not forget the victim.

[¶ 54] Having now a complete picture of the victim impact information about Corporal Martinez's personal qualities and the effect of the crime on his family members and a complete picture of the prosecutor's comments about that information, we can measure that information and those comments against the particular concerns identified by the Supreme Court in *Booth*, *Gathers*, and *Payne:* (1) are the information and comments, whether considered separately or in combination, inflammatory and so unduly prejudicial that they rendered the trial fundamentally unfair, and (2) have the information and comments, whether considered sepa-

rately or in combination, diverted the jury's focus from Harlow's characteristics and record and the circumstances of the crime. With the highest degree of confidence, we find that the information and comments, considered separately and in combination, are not inflammatory and prejudicial in the least; and have not in the slightest diverted the jury's focus from Harlow's characteristics and record and the circumstances of the crime. The prosecutor's comments in opening statement and closing argument are refreshingly brief and totally innocuous. There is no inflammatory rhetoric to be found in those comments. The same assessment applies equally to the statements themselves. We have no doubt that what the jurors heard from these brief non-inflammatory innocuous statements, they already knew as human beings based upon their common sense and experience in life's affairs. From the undisputed simple fact that Corporal Martinez was a guard at the state penitentiary, the jurors surely had already inferred, without having to be told, that he was a good man possessing positive personal qualities. From the undisputed simple fact that he had a parent, a wife, and children, the jurors had already inferred, without having to be told, that his family members missed him. That the prosecution presented the statements through Ranae Baldes, and not through the family members, helped ensure that any emotional edge in the statements was minimized. The quantum of victim impact evidence and comment thereon was negligible in comparison to the quantum of evidence of and comment about aggravating and mitigating circumstances, Harlow's characteristics and record, and the circumstances of the crime. That overwhelming quantum of evidence was presented to the jury well before the negligible quantum of victim impact evidence was.

■ [¶ 55] In our consideration of these particular concerns of undue prejudice and diversion of the jury's focus, we have also examined the trial court's instructions to the jury[4] in order to determine if one or more of

---

4. Interestingly, neither the prosecution nor the defense sought an instruction on victim impact evidence; and the trial judge did not give one. In briefly discussing a similar situation in *Turner v. State*, 268 Ga. 213, 486 S.E.2d 839, 842–43 (1997), the Georgia Supreme Court observed that "other states require that the jury be instructed on the purpose of victim impact evidence," citing *State v. Muhammad*, 145 N.J. 23, 678 A.2d 164 (1996); *Cargle v. State*, 909 P.2d 806, 828–29 (Okla.Crim.App.1995); and *Evans v. State*, 333 Md. 660, 637 A.2d 117 (1994). *Turner*, at 842 n. 12. The Georgia Supreme Court suggested the following example of such an instruction:

> The prosecution has introduced what is known as victim impact evidence. Victim impact evidence is not the same as evidence of a statutory aggravating circumstance. Introduction of victim impact evidence does not relieve the state of its burden to prove beyond a reasonable doubt the existence of a statutory aggravating circumstance. This evidence is simply another method of informing you about the harm caused by the crime in question. To the extent that you find that this evidence reflects on the defendant's culpability you may consider it, but you may not use it as a substitute for proof beyond a reasonable doubt of the existence of a statutory aggravating circumstance.

*Id.* at 843. In Oklahoma, where the legislature revised the death penalty statute after *Payne* to provide for the consideration of victim impact evidence during sentencing proceedings, the Court of Criminal Appeals promulgated the following instruction:

> The prosecution has introduced what is known as victim impact evidence. This evidence has been introduced to show the financial, emotional, psychological, or physical effects of the victim's death on the members of the victim's immediate family. It is intended to remind you as the sentencer that just as the defendant should be considered as an individual, so too the victim is an individual whose death may represent a unique loss to society and the family. This evidence is simply another method of informing you about the specific harm caused by the crime in question. You may consider this evidence in determining an appropriate punishment. However, your consideration must be limited to a moral inquiry into the culpability of the defendant, not an emotional response to the evidence.
>
> As it relates to the death penalty: Victim impact evidence is not the same as an aggravating circumstance. Proof of an adverse impact on the victim's family is not proof of an aggravating circumstance. Introduction of this victim impact evidence in no way relieves the State of its burden to prove beyond a reasonable doubt at least one aggravating circumstance which has been alleged. You may consider this victim impact evidence in determining the appropriateness of the death penalty only if you first find the existence of one or more aggravating circumstance has been proven beyond a reasonable doubt by evidence independent from the victim impact evidence, and find that the aggravating circumstance(s) found outweigh the finding of one or more mitigating circumstances.

them instructed the jury to avoid emotional decision-making, to exercise reasoned judgment, and to focus on only relevant evidence pertaining to the alleged aggravating and mitigating circumstances, the defendant's characteristics, record, background, and any circumstance surrounding the crime which serves to mitigate his culpability. In these regards, jury instructions were given which impressed upon the jury that it must follow all of the instructions (No. 1), it must consider the aggravating and mitigating circumstances relevant to the question of the sentence (No. 1), it must not consider whether the death penalty was appropriate unless the jury first unanimously agreed that the State had proved beyond a reasonable doubt the existence of at least one statutory aggravating circumstance (Nos. 3, 6, and 7), it may find that a life sentence is the appropriate punishment even if no mitigating circumstances were found to exist (No. 4), it may make deductions and reach conclusions that reason and common sense lead it to draw from facts which have been established (No. 5), the State was alleging the existence of three statutory aggravating circumstances and the jury must limit its consideration of aggravating circumstances to only those three and must not consider any other fact or circumstance which it may believe requires the death penalty in this case (Nos. 6 and 7), it must consider mitigating circumstances as to whether a life sentence may be more appropriate than a death sentence (No. 8), it must consider the statutory and non-statutory mitigating circumstances listed including any fact or circumstance of the defendant's character or prior record or background or matter surrounding his offense which serves to mitigate his culpability (Nos. 9, 10, and 12), it is never required to impose a death sentence and may consider sympathy or mercy for the defendant (No. 11), the mere number of aggravating or mitigating circumstances found to exist has no independent significance (No. 11), and it should not act hastily or without due regard for the gravity of the proceedings but should carefully con-

sider the evidence and bring to bear its best judgment upon the issues submitted to it (No. 15).

[¶ 56] We presume the jury follows the instructions. We have the highest degree of satisfaction that the jury instructions in this case appropriately instructed the jury to make a careful, reasoned judgment and directed the jury to focus on the aggravating and mitigating circumstances established by the evidence including any fact or circumstance of Harlow's characteristics, record, background, or circumstance of the crime which served to mitigate his culpability.

[¶ 57] For the above and foregoing reasons, we are convinced beyond a reasonable doubt no reasonable possibility exists that the erroneous introduction of the victim impact evidence and the prosecution's comment about it contributed in the slightest to the jury's determination that the appropriate penalty for Harlow is death.

## IV. Denial of Post–Trial Motions

[¶ 58] In arguing his seventh issue, Harlow contends that the trial court erred and this Court erred in denying post-trial motions for evidentiary hearings regarding alleged coercion of an inmate's testimony and the participation of a death penalty law clerk employed by this Court. Harlow asserts that the rulings denied him his right under the United States Constitution and the Constitution of Wyoming to a meaningful opportunity to be heard, to have his appeal reviewed on a complete record, and the effective assistance of counsel.

[¶ 59] In the ninth stated issue, Harlow does not purport to appeal any order or action by the trial court. Instead, he voices disapproval of the presence during the trial of the death penalty law clerk that figured prominently in the discussion of issue seven, and endeavors to elevate that disapproval to constitutional error. The portion of Harlow's brief designated as an overview of the ninth issue frames this issue as a chal-

As it relates to the other sentencing options: You may consider this victim impact evidence in determining the appropriate punishment as warranted under the law and facts in the case.

*Cargle,* 909 P.2d at 828–29.

lenge to the denial by the trial court of his motion for an evidentiary hearing followed by this Court's denial of the same. It is appropriate to consider issues seven and nine together. Our review of the denial of a post-trial motion for an evidentiary hearing is accomplished under the standard of abuse of discretion. *Story v. State,* 788 P.2d 617, 621 (Wyo.1990).

[¶ 60] On June 1, 1999, Harlow filed in this Court a "Motion for Limited Remand for an Evidentiary Hearing and to Supplement the Record with that Hearing," along with a supporting memorandum. Harlow asked to be heard on two issues. First, the participation of the law clerk and, second, alleged threats or promises made to an eyewitness who was a prisoner.

[¶ 61] On the issue of the law clerk, Harlow offered these chronological assertions:

24 March 1998

The Wyoming Supreme Court entered into a "Death Penalty Law Clerk Contract" with [the law clerk]. That contract requires [the law clerk] to "perform such legal research services as may be directed by the various District Court Judges or the Supreme Court, in connection with death penalty cases."

4 May 1998

Briefing commenced in Wyoming's current flagship death penalty case, *Martin J. Olsen v. State of Wyoming,* S.Ct. Docket 98–62.

* * * *

18 December 1998

* * * * Upon consultation with the State Public Defender about this issue, counsel was led to understand that [the law clerk] had an office within the Wyoming Supreme Court and, probably, had access to the Court's internally circulating opinions, including *Olsen v. State.*

Harlow continued:

If [the law clerk] was, in fact, privy to the confidential particulars of this Court's currently internally circulating opinion [in *Olsen v. State*], his participation as an advising law clerk in Mr. Harlow's case, as well as those of Mr. Dowdell and Mr. Collins, violated those defendants' due pro-

cess rights and reserved rights under the Wyoming and United States Constitutions if [the law clerk's] thumb was secretly laid upon the scales of justice.

If [the law clerk's] legal advice to the trial court influenced or determined how the court ruled regarding defense motions and jury instructions and was based on [the law clerk's] secret knowledge of how *Olsen* was being decided by this Court, Mr. Harlow['s] 5th, 6th, 9th, and 14th Amendment rights were breached and his trial was fundamentally unfair.

Premised on these assertions, Harlow contends that an evidentiary hearing was necessary to "establish the facts" surrounding the law clerk's "behind the scenes conduct."

[¶ 62] The State responded with its "Opposition to Appellant's Motion for Limited Remand for an Evidentiary Hearing and to Supplement the Record with that Hearing." Attached to its pleading was an affidavit in which the law clerk affirmed that he had not been privy to confidential information regarding this court's decision in *Olsen v. State.* Harlow filed a reply to the State's response, and we issued our "Order Consolidating Appeals, Granting Permission to Exceed Page Limits and Denying Partial Remand for Hearing on Alleged Irregularities." That order is attached as Appendix B to this opinion.

[¶ 63] Harlow persisted by presenting a "Motion to Reconsider Order Limiting Page Limitation to 105 Pages and to Permit Appellant's Brief not to Exceed 245 Pages and to Reconsider Denial of Partial Remand for Hearing on Alleged Irregularities and Motion to Supplement the Record With the Filings and Transcripts in *State v. Dowdell.*" We then entered a consistent "Order Denying Motion for Reconsideration of Denial of Partial Remand" in response to Harlow's motion.

[¶ 64] Harlow earnestly contends that in some way the Court improperly participated in Harlow's trial by means of the death penalty law clerk. We did, however, treat this issue definitively in our "Order Consolidating Appeals, Granting Permission to Exceed Page Limits and Denying Partial Remand

for Hearing on Alleged Irregularities." We revisit this contention only briefly.

[¶ 65] In participating in Harlow's trial, the death penalty law clerk could furnish correct advice to the trial court or he could furnish incorrect advice. His role was limited to that of any support personnel for the trial court. If the court acted upon incorrect advice, that would be manifest in the record, and any such error would be attacked in this appeal. If the trial court adopted and applied correct advice, there is no possibility of harm to Harlow. We are satisfied, at a pragmatic level, that regardless of the source of information the death penalty law clerk presented to the trial court, the only possible question is whether the advice was correct or not. The endeavor to manipulate this court by a complaint that this participation was wrong and that somehow this court infringed Harlow's constitutional rights by providing a death penalty law clerk is singularly unavailing. Clearly there is no basis to claim error because of the participation of the death penalty law clerk in Harlow's trial.

 [¶ 66] With respect to the prisoner who was a witness, Harlow asserted in his motion:

12 May 1999

Harlow's appellate counsel was notified that the same [prisoner witness] who had testified against Mr. Harlow had been cross-examined, in his very recent first degree sexual assault trial, by Laramie County Assistant District Attorney, Mary Beth Wolff. In response to Ms. Wolff's questions during cross examination, [the prisoner witness] testified that the Department of Corrections had coerced him into testifying against Mr. Harlow. The pressure included the throwing of fake blood into [the prisoner witness'] cell by penitentiary guards to encourage his cooperation. Following counsel's investigation, the reports of [the prisoner witness'] testimonial revelations were confirmed and counsel immediately ordered the production of that transcript. Counsel will seek to supplement that transcript into this record when that transcript is made available.

27 May 1999

Harlow's appellate counsel received an affidavit from Diane Lozano, Assistant Public Defender for the State of Wyoming Public Defender's office. Ms. Lozano was co-counsel in [the prisoner witness'] recent sexual assault case and witnessed [the prisoner witness'] testimony that he had been pressured by the guards to cooperate against Mr. Harlow and had testified that "he was isolated from the prison population upon implications that he would be released back into population as a suspected snitch if he did not cooperate."

Premised on these assertions, Harlow contends that an evidentiary hearing was necessary to "determine the caliber of the threats and/or promises made against and to [the prisoner witness.]"

[¶ 67] In our "Order Consolidating Appeals, Granting Permission to Exceed Page Limits and Denying Partial Remand for Hearing on Alleged Irregularities" we also dealt definitively with this contention. We addressed and refuted the claims of both threats and promises, saying:

10. Appellant's counsel speculates that [the prisoner witness] was pressured to testify against the appellant:

"In response to Ms. Wolff's questions during cross-examination [a verbatim transcript of which was later provided to the Court by appellee and labeled for purposes of this order as [the prisoner witness/X], [the prisoner witness] testified that the Department of Corrections had coerced him into testifying against Mr. Harlow [the appellant]. This pressure included the throwing of fake blood into [the prisoner witness'] cell by penitentiary guards to encourage his cooperation. Following counsel's investigation, the reports of [the prisoner witness'] testimonial revelations were confirmed * * *. "

[June 1, memo, at page 7.]

10A. In fact, careful review of [the prisoner witness]/X reveals no hint of the apparently false and inflammatory speculation as to the "throwing of fake blood[.]" Counsel for the appellant is encouraged to be forthcoming with the Court about how he "confirmed" this apparent fabrication.

11. Appellant's counsel next speculates that [the prisoner witness] was isolated from the prison population upon implications that he would be released back into [the prison] population as a suspected snitch if he did not cooperate. [June 1, memo, at page 8.]

11A. [The prisoner witness], in fact, testified that he came forward as a witness at the very moment that Cpl. Martinez was being killed [the prisoner witness/x/Harlow, at pages 75–76], and thereafter:

"I [the prisoner witness] fended for my own life for 14 months after the murder. I remained on the maximum security yard 14 months after the murder as a known witness to the crime."

[The prisoner witness/X, at page 87.] Clearly, any threat to isolate [the prisoner witness] and then return him to the general population as a snitch would have been meaningless insofar as his testimony shows that he had already spent 14 months on the maximum yard, in and amongst the very most dangerous inmates, after the murder as a known snitch.

12. Finally, the appellant speculates that [the prisoner witness] received "an unusually quick parole as an incentive for his testimony [against the appellant]." [June 1, memo, at page 12.]

12A. In contradiction of the appellant's speculation, [the prisoner witness]/A clearly demonstrates the strong perception of [the prisoner witness] that his parole was not hastened, but delayed by the killing of Cpl. Martinez and [the prisoner witness'] role as a witness to that killing.

[¶ 68] Upon reviewing our June 29, 1999 order, we remain convinced that our ruling was appropriate for the reasons articulated therein, and that we did not abuse our discretion. As this Court recently stated, "[a]bsolutes are dangerous, but in this instance this Court truly believes that we said what we meant and, without question, we meant what we said." *Smith Keller & Associates v. Dorr,* 4 P.3d 872, 875 (Wyo.2000). We hold that there was no error committed in denying an evidentiary hearing with respect to the prisoner witness.

## V. Denial of Motion to Supplement Appellate Record

[¶ 69] Harlow's statement of his eighth issue is framed as a challenge to the denial of an evidentiary hearing, but his argument addresses the denial of a motion to supplement the appellate record. The brief ·does not identify the order that is appealed in this issue. It is clear from the argument, however, that Harlow is dissatisfied with our refusal to allow him to supplement the record in this case with the testimony, offered in the case of *State v. Dowdell,* of an inmate who also testified at Harlow's trial.

[¶ 70] This Court has not previously established a standard for reviewing the denial of a post-trial motion to supplement the record on appeal. Harlow urges us to review this question *de novo,* as one of law. The State proposes review under our abuse of discretion standard, because our rules of appellate procedure address supplementation in discretionary terms. We will apply the abuse of discretion standard in reviewing post-trial motions to supplement a record. *See Watson v. State,* 722 So.2d 475, 480 (Miss.1998) ("The standard of review of a post-trial motion is abuse of discretion."); *Brown v. State,* 960 S.W.2d 772, 778 (Tex. App.1997).

[¶ 71] In this Court's order of June 29, 1999, we denied Harlow's request for an evidentiary hearing regarding the inmate witness. In that order we acknowledged that we had reviewed:

8. A portion of the direct examination and all of the cross-examination of [the prisoner witness] at the trial of appellant's co-defendant, Dowdell, produced by the appellee ([the prisoner witness]/x/Dowdell)[.]

In the findings segment of the order we said:

9. The appellant further speculates that "[the prisoner witness] was a key witness [against the appellant], in that the State presented him as an eyewitness, [and] his testimony was crucial to Mr. Harlow's conviction." [June 1, memo, at page 12.]

9A. In fact, the appellant offers no credible support for the import of [the prisoner witness] as a witness against appellant. The appellee's submissions show that [the prisoner witness'] dislike of the appellant may be easily inferred. [*See* [the prisoner witness]/x/Dowdell, at pages 837–38.] [The prisoner witness], however, was not an eyewitness against the appellant, consistently testifying that he saw Dowdell and Collins (the appellant's 2 co-defendants) but did not see the appellant near Cpl. Martinez when Martinez was killed. [*See* [the prisoner witness]/x/Dowdell, at page 841; [the prisoner witness]/x/Harlow, at pages 74–75, 87.]

[¶ 72] On July 6, 1999, Harlow filed with this Court a pleading styled "Motion to Reconsider Order Limiting Page Limitation to 105 Pages and to Permit Appellant's Brief not to Exceed 245 Pages and to Reconsider Denial of Partial Remand for Hearing on Alleged Irregularities and Motion to Supplement the Record with the Filings and Transcripts in *State v. Dowdell*," along with a memorandum in support of that motion. Despite the title, the motion makes no mention of supplementing the record with materials from *State v. Dowdell.* The accompanying memorandum, however, includes the following:

Appellant necessarily moves herein to supplement the record with the transcripts of the trial and related matters in *State v. Dowdell.* Only by citing to that record in this appeal, can Appellant demonstrate that the State offered testimony *in State v. Dowdell,* according to former district judge and defense counsel Wolfe, that [the prisoner witness] had asked someone to lie for him and in *State v. Harlow* offered [the prisoner witness] as the paragon of credulity; * * *.

The State filed a reply the next day, but did not address the request to supplement the record. We denied Harlow's motion on July 20, 1999.

[¶ 73] Harlow now contends that this Court relied upon a portion of the trial transcript from *State v. Dowdell* in our June 29, 1999, determination that the inmate was not an eyewitness against Harlow. He reasons that he must be permitted to supplement the record with the transcript of that trial in order to refute the determination that the prisoner witness was not an eyewitness against Harlow. Harlow concludes that, by denying that supplementation, we have violated his Fourteenth Amendment right to a meaningful opportunity to be heard.

[¶ 74] Harlow's argument is flawed in its factual premise. We did not, indeed could not, rely on the partial transcript from Dowdell's trial to rule that the prisoner witness was not an eyewitness against Harlow. Only at Harlow's trial could a witness testify as an eyewitness against Harlow. Anything the prisoner witness said about Harlow at Dowdell's trial is not relevant or useful in resolving that question. The reference to the Dowdell transcript on page 6 of the June 29, 1999, order was made only to support the proposition that the prisoner witness testified "consistently" that he only observed the other two inmates near the victim at the time he was killed. The thrust of that reference did not constitute a determination that the prisoner witness was not an eyewitness against Harlow. It simply explained the limitation of the testimony with respect to Harlow's participation. The argument on this issue is sophistry, and we affirm our denial of his motion to supplement the appellate record with the record from *State v. Dowdell.*

## VI. Proportionality Contentions

[¶ 75] Harlow contends his death sentence is disproportionate to both his culpability in the murder of the victim and the life sentences received by his co-defendants. In support of his tenth issue, he argues that his participation in the assault upon Corporal Martinez was minor, and that he did not know or intend that the Corporal would be killed. We resolve the issue of whether Harlow's sentence is disproportionate to his level of culpability in the crime by applying two decisions of the United States Supreme Court, *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).

[¶ 76] In *Enmund,* a majority of five members of the Court reversed the death sen-

tence of an appellant who drove the getaway car in an armed robbery that resulted in two murders when the intended victims resisted. The Court held that Enmund's death sentence was unconstitutional because he did not kill and did not intend for the killings to occur:

> Because the Florida Supreme Court affirmed the death penalty in this case in the absence of proof that Enmund killed or attempted to kill, and regardless of whether Enmund intended or contemplated that life would be taken, we reverse the judgment upholding the death penalty and remand for further proceedings not inconsistent with this opinion.

*Enmund,* 458 U.S. at 801, 102 S.Ct. at 3378–79.

[¶ 77] In *Tison,* the Court affirmed the death sentences of two appellants. The appellants had helped two convicted murderers escape from prison, armed them with shotguns, and stood by while they killed an unarmed family of four. *Tison,* 481 U.S. at 139–41, 107 S.Ct. at 1678–79. The United States Supreme Court said:

> [W]e hold that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.

*Id.* at 157–58, 107 S.Ct. at 1688. The Court distilled that reasoning into a statement that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement." *Id.* at 158, 107 S.Ct. at 1688.

[¶ 78] Harlow and the State agree that *Tison* captures the correct rule to be applied in this instance. They disagree, however, as to the result that rule demands. Harlow contends that his role in the escape attempt and murder was minor, and that he did not act with reckless indifference to human life. In support of that claim he asserts that he was recruited for the escape attempt at the last minute; he was not aware that Martinez would be killed; and Collins and Dowdell inflicted all of the stab wounds on Martinez. The State argues that Harlow's participation in the murder was major.

[¶ 79] The State's position is supported by the fact that the jury did not find as a mitigating factor that Harlow's participation was minor. While several jurors opined individually that other mitigating circumstances existed, none of them declared that Harlow's participation was minor. The record includes evidence that Harlow knew his compatriots were armed with shanks, and that he armed himself and also offered to provide better weapons to Collins and Dowdell. The record establishes that Harlow was the first of the three to enter Shift Command; struck the first blow against Corporal Martinez; struck additional blows after that; and held Corporal Martinez from behind while Collins and Dowdell stabbed him. In addition, a witness testified that upon leaving Shift Command after the attack, Harlow said either "We got one of them" or "I got one of them."

[¶ 80] This evidence suffices to establish that Harlow was a major participant in the murder of Corporal Martinez and acted with reckless indifference to human life. We hold that the standard articulated in *Tison* is satisfied in this case.

[¶ 81] Harlow also argues that his sentence is disproportionate to the life sentences received by Collins and Dowdell, who inflicted the fatal wounds. Apparently, Harlow seeks to have this Court reincarnate a statute that the state legislature repealed in 1989. Before its repeal Wyo. Stat. Ann. § 6–2–103(d)(iii) (Michie 1988) read:

> d) With regard to the sentence, the court shall determine if:
>
> \* \* \* \*
>
> (iii) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

Even while that statute was in effect, however, we held that "[a]ccomplices in crime need not be sentenced alike; a sentence should be

patterned to the individual defendant." *Hopkinson v. State*, 664 P.2d 43, 63 (Wyo.1983).

[¶ 82] The record before us contains no information about whether the juries in the trials of Collins and Dowdell found any mitigating circumstances to exist, or what aggravating circumstances they found to exist. To hold that Harlow's death sentence is disproportionate to Collins' and Dowdell's life sentences would require us to speculate about the aggravating circumstances and the mitigating circumstances that may have been determined in order to make their situations truly analogous to Harlow's. We cannot engage in speculation as to facts not presented in the record. *Hopkinson*, 664 P.2d at 85. We hold that the death sentence imposed upon Harlow has not been shown to be disproportionate to either his individual culpability in the murder or the life sentences imposed upon Collins and Dowdell.

### VII. Constitutionality of Death Penalty Statute

[¶ 83] The issue of the unconstitutionality of the Wyoming death penalty statute presented in Harlow's eleventh issue is substantially the same as that submitted in *Olsen v. State*, 2003 WY 46, ¶ 89, 67 P.3d 536. After a thorough review of the historical background and substantive law surrounding the development of the death penalty statute, particularly with respect to the "weighing" or "non-weighing" controversy, we held that the statute is constitutional. *Id.* at ¶ 103. We ruled that so long as "Wyoming's death penalty statute genuinely narrows the class of defendants eligible for the death penalty and provides for an individualized determination and appellate review[,]" it is sufficient. *Id.* at ¶ 102. We specifically held "that Wyoming's death penalty statute is a constitutional, weighing statute." *Id.* at ¶ 103. That analysis and determination is dispositive of Harlow's claim that the statute is unconstitutional. Therefore, we hold that Wyoming's death penalty statute is constitutional.

### VIII. Denial of Post–Trial Motions Regarding 1988 Murder Conviction

[¶ 84] In his twelfth issue, Harlow challenges the denial of his December 7, 1998,

post-trial motion in which he sought to supplement the appellate record with documents from two earlier proceedings in this Court, identified as No. 98–272 and No. 98–276, in which he challenged his 1988 murder conviction. That conviction was the basis for one of the aggravating circumstances that the jury found to exist. As determined in our discussion of Harlow's eighth issue, abuse of discretion is the correct standard of review for this question.

[¶ 85] Before his trial in this case, Harlow filed a motion in the district court to withdraw his 1988 plea of *nolo contendere* to a first degree murder charge, and his guilty pleas to two counts of attempted first degree murder and one count each of first degree sexual assault and aggravated robbery. After a hearing, the district court denied that motion. Harlow's appeal to this Court from his convictions based upon those pleas was designated case No. 98–276. The State moved for dismissal of the appeal for lack of jurisdiction. On September 22, 1998, we entered our "Order Denying Jurisdiction Over Late–Filed Motion to Withdraw Guilty Pleas." In that order we said:

> Having carefully reviewed the State's motion and the appellant's response thereto, the Court adheres to the rule of promptness under which motions to withdraw guilty pleas must be made promptly, at the earliest possible moment, or at least within a reasonable time after entry of the pleas, and we find that the State's motion should be granted, dismissing the appeal for lack of jurisdiction.

That same day, in case No. 98–272, we denied Harlow's petition for a writ of habeas corpus, seeking release from his imprisonment on the 1988 convictions.

[¶ 86] In his motion filed in this case on December 7, 1998, Harlow sought to supplement the record on appeal with the records in Nos. 98–272 and 98–276. The district court denied that motion on December 11, 1998, and Harlow appeals the order denying that motion. He contends that the 1988 conviction was invalid and should not have been considered as an aggravating circumstance in the determination of his sentence. From that premise, Harlow reasons that the record

on appeal must include the records from Case Nos. 98–272 and 98–276 to ensure his ability to argue the validity of his earlier conviction on direct appeal or in a federal habeas petition.

[24] [¶ 87] Authority for supplementing the record on appeal is found in W.R.A.P. 3.04:

> If any difference arises as to whether the record discloses what occurred in the trial court, the difference shall be submitted to and settled by that court and the record made to conform to the truth. If anything material to either party is omitted from the record by error or accident or is misstated, the parties by stipulation, or the trial court either before or after the record is transmitted to the appellate court, or the appellate court on motion or its own initiative, may direct that the omission or misstatement be corrected, and if necessary that a supplemental record be certified and transmitted. All other questions as to the form and content of the record shall be presented to the appellate court by motion.

Based on the last sentence of that rule, we infer that Harlow intended his motion to supplement to be decided according to the procedure prescribed in the rule, else he would have presented his request directly to this Court. The language of Rule 3.04 provides that the trial court may order a supplemental record certified and transmitted, if something material has been omitted or misstated. As the State points out, the materials Harlow seeks to have included in the record "were not included in the present appellate record because such were not made a matter of record below in support of any issue put before the trial court." Those materials had no part in the trial of this case, and the rule justifies only the inclusion of materials omitted from the record on appeal. It does not offer a vehicle to augment the record made in the trial court. We discern no abuse of discretion in the district court's decision to deny Harlow's motion to supplement the appellate record by including them.

## IX. Cumulative Error

[¶ 88] In his thirteenth and final issue, Harlow claims that the cumulative effect of the errors he asserted in his previous issues requires that his convictions should be reversed and remanded for a new trial, or in the alternative, his capital sentence should be set aside and a sentence of life imprisonment imposed. Because we have identified only one harmless error in Harlow's previous assertions, we need not consider this issue. *Kerns v. State,* 920 P.2d 632, 641(Wyo.1996); *Engberg v. Meyer,* 820 P.2d 70, 84 (Wyo. 1991).

[25, 26] [¶ 89] We customarily consider the requirements imposed by § 6–2–103 in death penalty cases even when review is sought by the defendant and that review is not simply the automatic review contemplated by that statute. Specifically, the statute requires:

> (c) The supreme court of Wyoming shall consider the punishment as well as any errors enumerated by way of appeal.
>
> (d) With regard to the sentence, the court shall determine if:
>
> (i) The sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;
>
> (ii) The evidence supports the jury's or judge's finding of an aggravating circumstance as enumerated in W.S. 6–2–102 and mitigating circumstances.
>
> (iii) Repealed by Laws 1989, ch. 171, § 2.
>
> (e) In addition to its authority regarding correction of errors, the court, with regard to review of death sentences, may:
>
> (i) Affirm the sentence of death;
>
> (ii) Set the sentence aside and impose a sentence of life imprisonment; or
>
> (iii) Set the sentence aside and remand the case for resentencing.

§ 6–2–103(c), (d), and (e). In this case the Court is satisfied that the evidence supports the jury's findings with respect to aggravating and mitigating circumstance. Harlow does not argue otherwise. In addition, it is our determination that the sentence of death

was not imposed under the influence of passion, prejudice or any other arbitrary factor.

[¶ 90] Neither the rulings and orders appealed by Harlow nor our independent search of the record disclose any reversible error. We affirm the Judgment and Sentence entered in the trial court, and the case is remanded to the trial court for the limited purposes of vacating the suspension of the sentence of death and the setting of a specific date for execution of that sentence.

## APPENDIX A

[Prosecutor]: Good afternoon. If you would state your name and your occupation, please, for us?

A. My name is Renae Baldes. I'm the Hot Springs County Victim/Witness Coordinator.

Q. You work here in this building?

A. Yes.

Q. And I've imposed upon you, have I not, to read something into the record today?

A. Yes.

Q. All right. I've supplied you with a copy of a Victim Impact Statement, and you've reviewed it. Is that also correct?

A. Yes.

[Prosecutor]: If I may approach, Your Honor?

Court: Yes.

[Prosecutor]: Thank you. I have marked State's P–30 as an exhibit for purposes of the record, Your Honor. You've reviewed this and ordered its reading and admission in this fashion.

Q. I'll hand you P–30. You recognize it, I take it?

A. Yes.

Q. All right. I would ask at this time, Ms. Baldes, as best you can, talking into the microphone, to read from the exhibit Roman Numeral I and Roman Numeral II. You may begin as you see fit.

A. Okay. No. 1, The Victim's father, Charlie Martinez:

I would like to take this opportunity to tell you just a little bit about my son, Wayne Martinez. Wayne was a source of joy to his friends and family. Laughing and joking, Wayne always knew what to say to make you smile.

Wayne was a devout Catholic. His love of God and his family being his top priority as the standard by which he led his life.

He enjoyed music and dancing. Wayne liked to entertain his family, singing and playing Spanish songs on the guitar accompanied by his only brother. His brother was also his best friend.

Wayne was an honest child who never got into trouble or used drugs or alcohol. He told me he wanted to be a police officer. Wayne was always respectful of his elders. He enjoyed fishing and camping and traveling to New Mexico to visit his aunts and uncles and grandparents. Wayne did not make time to be with his family, it was just a part of him, just as going to school or work.

As an adult Wayne worked hard. He loved to cook and he was a wonderful sauté chef. Later he would put in his eight hours at the Wyoming State Penitentiary, along side his coworkers, who say he always had a smile on his face. He never complained, he just did his job the best he knew how. He treated everyone with respect, including the inmates.

After work and on his days off, he devoted his time to his family. Wayne volunteered in his daughter's preschool, and then later in grade school classrooms as a parent volunteer, helping with fund-raising and as – and anywhere else he was needed.

He enjoyed traveling on the weekends. He liked to take his children to Denver, and he even took them to a professional basketball game.

Wayne also took care of me. His daily visits were sometimes short, being busy with children of his own, but I came to rely on his words and laughter as a source of hope of another day. There is not a day that goes by that he is not missed. I know that if he could, Wayne would know what to say to make me feel better.

The loss of Wayne has been very tough on me personally, but it has also created a tre-

mendous void in the lives of his children, widow and surviving brother. He was taken from us much sooner than would have been a normal life span.

The sense of loss and grief are with us constantly, and in my own case, sometimes almost overwhelming.

The death of my son has caused insomnia, depression, and mood swings. I have consulted with a counselor, and a physician has prescribed medication for the depression.

My work suffered to the extent that, because Wayne was buried in the cemetery where I work, I had to ask the city to assign me to another location.

I have been able – I have been unable to interact with people on a social level, spending more time in the house than previously. It is hard for me to deal with people in the same manner as before the murder. I have lost a large part of my sense of humor and just don't care to participate in social gatherings.

Roman Numeral II, The Victim's wife, Jessica Martinez:

Wayne was a great father. He would do anything for his kids and always had at least one with him wherever he went. He would volunteer at their schools and go and visit them at school on his day off. He even volunteered to be Frosty the Snowman for Deseree's Christmas program.

Wayne was also this way towards me. He would do anything for me, even if he was tired and I needed something done, he would get up and do it. I remember when I was pregnant, I would want nachos from 7-11 late at night, and no matter what time it was, and it didn't matter that he had to go to work early, he would go and get me nachos.

He encouraged me to go back to school and get a teaching degree. And when I felt like I couldn't do the work or didn't want to, he pushed me and made me feel like I could do anything.

Wayne loved his family. He would do anything for us, but he also had many friends and would do anything to help them out if they needed it. If his friends or family needed anything, and he couldn't – and he could give it to them, he would.

Wayne was a very generous person. It is hard to tell people what he was like, because he was so many great things, it wasn't just one or two things that made everyone who knew him love him, it was everything about him.

I am depressed and stressed out most of the time. I miss him so much, and I know our kids miss him. It's really hard trying to tell a three year old their daddy is in heaven, and they won't be able to see him anymore.

Because of what these people did, my eight year old, six year old, and I have had to go to counseling. The hardest thing for me is trying to keep everything together and try not to let my kids see me crying. It's hard on all holidays and birthdays and I just don't think they fully understand everything that is going on.

I don't go to sleep until late at night, because I can't bear to wake up another day without the person I loved and woke up to for the past seven and a-half years. It's hard to keep letting people believe I can handle this, especially my children, when I'm not sure I can.

It's hard to raise my children alone, without my husband, because he was so much into their school work and everyday activities. Even my schooling was hard, because he was the one who really pushed me to do good. It was Wayne who helped all of us with everything, and now that he is gone, it's hard for me to do what he did for my kids and me.

[Prosecutor]: Thank you, Ms. Baldes. You may step down. Your Honor, reserving our right to rebuttal, the State rests.

## APPENDIX B

### ORDER CONSOLIDATING APPEALS, GRANTING PERMISSION TO EXCEED PAGE LIMITS

#### AND DENYING PARTIAL REMAND FOR HEARING ON ALLEGED IRREGULARITIES

This matter came before the Court upon the motions of the appellant: i. To consolidate the above entitled appeals, ii. For permission to exceed the 70 page limitation for

the appellant's principal brief, and, iii. For a limited evidentiary remand in order to investigate speculative violations of the appellant's right to due process of law. Review of the appellant's motions, the memorandum submitted in support thereof (June 1, memo), the State's memo in response thereto, the appellant's reply to the State's response (June 8, memo), the State's surrejoinder, the appellant's supplemental motion and his final motion to suspend briefing schedule reveal the presence of several allegedly factual attachments, more precisely described as follows:

1. The Death Penalty Law Clerk Contract (Contract) between then-Chief Justice William A. Taylor (Ret.) and Allen C. Johnson, produced by the appellant;

2. A partial transcript of arguments of counsel from the pre-trial conference of the appellant's trial, produced by the appellant;

3. An index to the testimony of [the prisoner witness] at the appellant's trial, but no transcript of that testimony, produced by the appellant;

4. An affidavit made by Diane M. Lozano, Esq., on May 26, 1999, produced by the appellant (Lozano I);

5. An affidavit made by Allen C. Johnson, Esq., on June 4, 1999, produced by the appellee;

6. An affidavit made by Diane M. Lozano, Esq., on June 14, 1999, produced by the appellee (Lozano II)

7. A full transcript of the cross-examination and re-direct examination of [the prisoner witness] made at his trial for first degree sexual assault, produced by the appellee ([the prisoner witness]/X);

8. A portion of the direct examination and all of the cross-examination of [the prisoner witness] at the trial of appellant's co-defendant, Dowdell, produced by the appellee ([the prisoner witness]/x/Dowdell);

9. A portion of the direct examination and all of the cross-examination of [the prisoner witness] at the appellant's trial for the first degree murder of Cpl. Wayne Martinez, produced by the appellee ([the prisoner witness]/x/Harlow).

Having carefully reviewed the pleadings of the parties and the aforementioned materials presented as support for those allegations, the Court does make the following findings:

1. The ends of judicial economy would best be served by consolidation of the above entitled appeals and such a consolidation should be granted;

2. In preparation of his brief, the appellant should have permission (as should the appellee) to file and serve a principal brief which shall not exceed 105 pages in length;

3. At page 2 of his June 1 memo, the appellant asserts a desire "to supplement the record pursuant to Rule 3.04, W.R.A.P., so that two issues not currently visible in the record may be developed[;]"

3A. W.R.A.P. 3.04 is inapposite to 'development' of evidence concerning matters asserted after trial is complete, being available only "[i]f any difference arises as to whether the record discloses what occurred in the trial court[.]" [W.R.A.P. 3.04] (*see also* June 8, 1999, order for settlement of the record, as made and entered in *Wells et al. v. Board of Trustees of Laramie County School Dist. # 1,* Case No. 99–99).

4. Later in his June 1 memo, the appellant cites the concurring opinion of Golden, J., in *Calene v. State,* 846 P.2d 679, 694 (Wyo.1993), for the proposition that when an appellant wishes to reopen the record in a completed trial for the purpose of supplementation, *Calene* is the appropriate vehicle. [Appellant's June 1 memo, at page 11]

4A. *Calene,* by express and repeated terms, is only "available for appellant to factually develop any contention claiming ineffectiveness of his legal representation which was not documented within the original trial record." *Calene,* 846 P.2d at 692 (*see also* June 16, 1999, order denying renewed request for remand for evidentiary hearing, as made and entered in *Chapman v. State,* Case No. 99–125; and May 4, 1999, order denying motion for partial remand, as made and entered in *Griswold v. State,* Case No. 99–45).

5. The appellant's only suggestion of ineffective assistance of counsel concerns "Allen Johnson's behind-the-scenes conduct * * * advis[ing] a trial judge with determinative legal advice," in an *ex parte* manner designed to deprive trial counsel of the opportunity to confront and combat Johnson's allegedly pro-prosecution advice. This speculation is supported only by the Contract and two cases: *Vaska v. Alaska,* 955 P.2d 943 (Alaska Ct.App.1998) (*Vaska*), and *Matter of Judicial Disciplinary Proceedings against Tesmer,* 219 Wis.2d 708, 580 N.W.2d 307 (Wis.1998) (*Tesmer*).

5A. Diane Lozano, as defense counsel in the trial of Collins (one of the appellant's co-defendants), and the self-identified "source" of much of the appellant's speculation, confirms that Allen C. Johnson did communicate with the Collins trial court privately, in the manner of law clerks since the memory of man runneth not to the contrary[1], but characterizes Johnson's behavior in chambers conferences as fair and even-handed. *Vaska* and *Tesmer* both ratify and validate that traditional notion of law clerk as the only proper confidante of the trial judge, e.g.:

'Law clerks are not merely the judge's errand runners. They are sounding boards for tentative opinions and legal researches who seek the authorities that affect decisions. Clerks are privy to the judge's thoughts in a way that neither [the] parties to the law suit nor [the judge's] most intimate family members may be.'

*Vaska,* 955 P.2d at 945, quoting *Hall v. Small Business Administration,* 695 F.2d 175, 179 (5th Cir.1983) [Brackets are found in *Vaska.*]

[T]he majority's view [is] unlike law clerks or judicial interns, litigants did not expect that Professor McCormack would be drafting language Judge Tesmer used in resolving legal questions.

*Tesmer,* 219 Wis.2d at 720, 580 N.W.2d at 312.

6. Eventually, in his June 8 memo, the appellant speculates that the role of Allen C. Johnson is improper:

Among other things, Appellant's counsel was informed that, in response to defense motions, Allen Johnson and the respective judges [at the trials of the appellant's co-defendants] would quite often disappear into chambers together, re-emerge moments later, the judge would rule against the defense and Johnson would sit, arms crossed and 'smirking' at defense counsel.

[Appellant's June 8 memo, at page 5]

6A. The fact is that appellant's speculative peradventures, as reiterated at paragraph 6, *supra,* are doomed to failure by: i. An absence of competent supportive materials, affidavits or otherwise, sufficient to establish the substantial nature of what must otherwise be characterized as counsel's information and belief; ii. The absence of relevance to appellant's trial of what was or was not observed at the trial of the appellant's co-defendants; and, iii. The contradiction afforded by Lozano II at paragraphs 10 and 11:

10. . . . Mr. Johnson did confer with the judge outside of our presence, and . . . I believe that Mr. Johnson exercised influence over the [trial] Court in regard to decisions that were made. * * *.

11. Mr. Johnson did participate in discussions between the attorneys and the judge, and offered his opinion several times. Both the state and the defense, as well as the [trial] Court, inquired about his opinion on various topics. Mr. Johnson supported the defense in some instances, as well as the state in some instances. Other time, Mr. Johnson offered no advice.

Lozano II demonstrates that Johnson behaved in a manner characterized as lawful and appropriate for law clerks by *Vaska* and *Tesmer, supra,* as well as Canon 3

---

**1.** *See* Canon 3 B(7) of the Wyoming Code of Judicial Conduct:

A judge may consult with court personnel whose function is to aid the judge in carrying out the judge's adjudicative responsibilities or with other judges.

B(7)(c) of the Wyoming Code of Judicial Conduct.

7. Eventually, the appellant speculates that:

> If Mr. Johnson was, in fact, privy to the confidential particulars of this Court's currently internally circulating opinion [in *Olsen v. State*, Case no. 98–62] his participation as an advising law clerk in Mr. Harlow's case ... violated [the appellant's] due process rights and reserved rights ... if Johnson's thumb was secretly laid upon the scales of justice.

[Appellant's June 8 memo, at page 9]

7A. Appellant's speculation concerning Allen C. Johnson's possible access to, or knowledge of, a circulating opinion in *Olsen, supra,* is defeated by factual impossibility insofar as there never has been, nor is there currently in existence a draft proposed opinion in the *Olsen* case, circulating or yet to circulate[2], and any and all information concerning the nature of that opinion remains strictly privileged as between the Chief Justice, the four Associate Justices, that Justice to whom the articulation of an opinion has been assigned and his personnel.

8. In the appellant's June 8 memo, his counsel disclaims having impugned the integrity of Allen Johnson or the Court, asserting that he is only undertaking his duty to conduct a "reasonable investigation," and asserting only that he was "informed" that Johnson might be privy to information concerning the Olsen opinion, and if such turned out to be true, there would be serious implications for the appellant's right to due process;

8A. Counsel has, in speculating as to the impropriety of Mr. Johnson's role then disingenuously disclaiming any such assertion, run afoul of our clearly articulated proscription upon blowing "hot and cold in the same breath. A party will just not be allowed to maintain inconsistent positions in judicial proceedings, as here." *Allen v. Allen,* 550 P.2d 1137, 1142 (Wyo.1976). The time for appellant to plead in the alternative has expired, and counsel for the appellant tests not only credulity, but the patience of this Court with his unsupported and internally inconsistent allegations concerning the role of Johnson as suggested in his June 1 memo, followed hard by the disclaimer in his June 8 memo.

9. The appellant further speculates that "[the prisoner witness] was a key witness [against the appellant], in that the State presented him as an eyewitness, [and] his testimony was crucial to Mr. Harlow's conviction." [June 1 memo, at page 12]

9A. In fact, the appellant offers no credible support for the import of [the prisoner witness] as a witness against appellant. The appellee's submissions show that [the prisoner witness'] dislike of the appellant may be easily inferred. [*See* [the prisoner witness]/x/Dowdell, at pages 837–38] [The prisoner witness], however, was not an eyewitness against appellant, consistently testifying that he saw Dowdell and Collins (the appellant's two co-defendants) but did not see the appellant near Cpl. Martinez when Martinez was killed. [*See* [the prisoner witness]/x/Dowdell, at page 841; [the prisoner witness]/x/Harlow, at page 74–75, 87]

10. Appellant's counsel speculates that [the prisoner witness] was pressured to testify against the appellant:

> "In response to Ms. Wolff's questions during cross-examination [a verbatim transcript of which was later provided to the Court by appellee and labeled for purposes of this order as [the prisoner witness]/X], [the prisoner witness] testified that the Department of Corrections had coerced him into testifying against Mr. Harlow [the appellant]. This pres-

---

**2.** It is true that this Court has contracted with Allen Johnson to provide assistance to the district courts in death penalty cases, and provided Johnson with office space pursuant to that contract. It is equally true that Allen Johnson is not privy to the internal or day-to-day workings of this Court, nor does Johnson have access, electronic or otherwise, to Court business. Mr. Johnson fulfills no clerking responsibilities for this Court pursuant to the Contract, which is administered by the source of the grant money which funds it.

sure include the throwing of fake blood into [the prisoner witness'] cell by penitentiary guards to encourage his cooperation. Following counsel's investigation, the reports of [the prisoner witness'] testimonial revelations were confirmed * * *."

10A. In fact, careful review of [the prisoner witness]/X reveals no hint of the apparently false and inflammatory speculation as to the "throwing of fake blood[.]" Counsel for the appellant is encouraged to be forthcoming with the Court about how he "confirmed" this apparent fabrication.

11. Appellant's counsel next speculates that [the prisoner witness] "was isolated from the prison population upon implications that he would be released back into [the prison] population as a suspected snitch if he did not cooperate." [June 1 memo, at page 8]

11A. [The prisoner witness], in fact, testified that he came forward as a witness at the very moment that Cpl. Martinez was being killed [[the prisoner witness]/x/Harlow, at pages 75–76], and thereafter:

"I [the prisoner witness] fended for my own life for 14 months after the murder. I remained on the maximum security yard 14 months after the murder as a known witness to the crime."

[[the prisoner witness]/X, at page 87] Clearly, any threat to isolate [the prisoner witness] and then return him to the general population as a snitch would have been meaningless insofar as his testimony shows that he had already spent 14 months on the maximum yard, in and amongst the very most dangerous inmates, after the murder as a known snitch.

12. Finally, the appellant speculates that [the prisoner witness] received "an unusually quick parole as an incentive for his testimony [against the appellant]." [June 1 memo, at page 12]

12A. In contradiction of the appellant's speculation, [the prisoner witness]/X clearly demonstrates the strong perception of [the prisoner witness] that his parole was

not hastened, but delayed by the killing of Cpl. Martinez and [the prisoner witness'] role as a witness to that killing.

13. In sum, the appellant's motion for partial remand is procedurally infirm, factually unsupported, and should be denied. It is, therefore,

**ORDERED** that the above entitled Cases, Nos. 99–58, 99–59, and 99–60, shall be, and the same hereby are, consolidated for purposes of briefing and decision; and it is, further,

**ORDERED** that permission of the Court shall be, and the same hereby is, given for the principal briefs of the parties to be no more than 105 pages in length; and it is, further,

**ORDERED** that the appellant's motions for remand with respect to the contractual district court law clerk Allen C. Johnson and [the prisoner witness] shall be, and the same hereby are, denied, as inappropriate under W.R.A.P. 3.04 or *Calene v. State*, 846 P.2d 679 (Wyo.1993), in addition to being factually unsupported; and it is, finally,

**ORDERED** that the appellant's motion to suspend current briefing schedule shall be, and the same hereby is, denied as moot.

**DATED** this 29th day of June, 1999.

BY THE COURT[3]:

/s/ Richard V. Thomas
for Larry L. Lehman
Chief Justice

## ORDER ISSUING MANDATE, SETTING NEW DATE FOR EXECUTION OF SENTENCE, AND STAYING EXECUTION OF SENTENCE PENDING FURTHER PROCEEDINGS

James Martin Harlow, aka Thorvaldr Sigwolf, was convicted by a jury of capital murder charged under Wyo. Stat. Ann. § 6–2–101(a) (Michie 1997), was sentenced to death by a jury under Wyo. Stat. Ann. § 6–2–102 (Michie 1997), and the trial court entered judgment and sentence on December 7, 1998. Mr. Harlow timely filed a notice of appeal, and his appeal was docketed in this Court on February 23, 1999. The sentence of death

---

**3.** Justice Hill took no part in consideration of this matter.

was stayed pending appeal. W.R.A.P. 5.01(a). This Court affirmed Mr. Harlow's judgment and sentence on April 14, 2003, and remanded the case to the trial court for the limited purpose of vacating the suspension of the sentence of death and the setting of a specific date for execution of that sentence.

Before the mandate issued, however, Mr. Harlow, on April 29, 2003, timely filed in this Court a petition for rehearing. W.R.A.P. 9.07. That filing had the effect of suspending proceedings under this Court's decision until this Court decided the petition. W.R.A.P. 9.08. While Mr. Harlow's petition for rehearing was pending, Mr. Harlow filed in this Court a motion for order of stay on April 29, 2003. In that motion, Mr. Harlow petitioned this Court "to continue the existing order of stay until such time as he has exhausted the remedies available to him at law to seek direct and collateral review of his judgment and capital sentence." In this regard, Mr. Harlow in his motion informs this Court that he intends to seek a writ of certiorari by timely applying to the United States Supreme Court in which application he will ask that Court to review the ultimate determination of his appeal by this Court. In his motion, Mr. Harlow implies that he may also seek a remedy under Wyo. Stat. Ann. § 7–14–101(Michie 1997) for violation of constitutional rights abridged during the proceedings which resulted in his judgment and conviction. In his motion, Mr. Harlow further informs this Court that he expects to pursue relief in the form of a petition for a writ of habeas corpus under 28 U.S.C. § 2254, after state review of his conviction and capital sentence is truly complete, or deemed to be unavailable.

In addition to his request in his motion that this Court continue the existing order of stay until he has exhausted the above-mentioned remedies, Mr. Harlow requests that this Court hold in abeyance the mandate to be issued in this case, at least until such time as direct review is completed. Alternatively, Mr. Harlow requests that this Court, upon its final disposition of this case, and in the event that it does not upon rehearing vacate Mr. Harlow's capital sentence in favor of a life sentence, direct the lower court to enter an order of stay of execution pending the completion of direct and collateral review available to Mr. Harlow and further order the State not to seek a warrant of execution during the pendency of Mr. Harlow's claims on direct and collateral review.

On May 20, 2003, this Court entered its order denying Mr. Harlow's petition for rehearing. This Court now shall dispose of Mr. Harlow's pending motion for order of stay. This Court considers it inappropriate to enter an order of stay as broad as Mr. Harlow seeks. This Court has determined that the better practice at this time is to employ a narrower approach which will promote the timely handling of those remedies that Mr. Harlow actually pursues. Under this approach, this Court, having denied Mr. Harlow's petition for rehearing, shall issue the mandate, vacate the suspension of the sentence of death, set a specific date for execution of that sentence, and then stay the execution of that sentence pending Mr. Harlow's timely application to the United States Supreme Court seeking a writ of certiorari, the time for filing a petition for writ of certiorari with that Court being ninety (90) days from the date of this Court's issuance of mandate. Having this Court set a new date of execution rather than remand to the trial court to set a new date of execution may help avoid some inherent delays in this case. This Court does not foreclose, however, this Court's remanding to the trial court to set a new date of execution if such course of action becomes appropriate in this case in the future. This Court shall further order Mr. Harlow's counsel to promptly inform this Court and the State of Wyoming of counsel's timely filing of application to the United States Supreme Court for a writ of certiorari asking that Court to review this Court's determination of his appeal. This Court shall further order Mr. Harlow's counsel to promptly inform this Court and the State of Wyoming when the United States Supreme Court has disposed of Mr. Harlow's petition for writ of certiorari. Upon that Court's disposition of Mr. Harlow's petition for writ of certiorari, this Court may make such further order as may then appear to be necessary and appropriate, if it still retains jurisdiction.

It is, therefore, ORDERED that the Motion for Stay filed April 29, 2003, be, and is hereby granted in part and denied in part;

It is further ORDERED that, this Court having denied Mr. Harlow's petition for rehearing by order dated May 20, 2003, the mandate shall issue forthwith on the date of this order;

It is further ORDERED that the opinion published in this case on April 14, 2003, *Harlow v. State*, 2003 WY 47, be, and it is hereby, modified by rescinding the remand to the trial court for the limited purpose of vacating the suspension of the sentence of death and the setting of a specific date for execution of that sentence;

It is further ORDERED that the suspension of the sentence of death is hereby vacated;

It is further ORDERED that the new date for execution of the sentence of death is July 18, 2003, a date more than thirty (30) days from the date of this order;

It is further ORDERED that the execution of that sentence of death is hereby stayed pending Mr. Harlow's timely application to the United States Supreme Court for a writ of certiorari, the time for Mr. Harlow's filing a petition for writ of certiorari with the United States Supreme Court being ninety (90) days from the date of this order;

It is further ORDERED that Mr. Harlow's counsel promptly notify this Court and the State of Wyoming of counsel's timely filing of application to the United States Supreme Court for a writ of certiorari asking that Court to review this Court's determination of his appeal;

It is further ORDERED that Mr. Harlow's counsel promptly inform this Court and the State of Wyoming when the United States Supreme Court has disposed of Mr. Harlow's petition for writ of certiorari;

It is further ORDERED that this order be published in Pacific Reporter Third.

BY THE COURT:*

/s/ Michael Golden
MICHAEL GOLDEN
Justice

---

* Justices Golden, Lehman, and Voigt and District Judges Sullins and Burke sitting by appointment.